# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 95-CA-00636-SCT

*HENRY CLAY BULLOCK, II*

*v.*

*CAROLYN BULLOCK*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/05/95 |
| TRIAL JUDGE: | HON. J. N. RANDALL JR. |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | KAREN J. YOUNG |
| ATTORNEY FOR APPELLEE: | MARGARET ALFONSO |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | REVERSED AND REMANDED - 7/31/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 9/5/97 |

**EN BANC.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. This appeal arises from an April 5, 1995 decree of the Hancock County Chancery Court granting Carolyn Bullock a divorce from Henry Clay "Hank" Bullock II on grounds of habitual cruel and inhuman treatment and ordering the equitable distribution of the couple's marital property. We find that the record supports the chancellor's determination that Carolyn was entitled to a divorce. Further, we affirm the award to Carolyn of various assets, including her State Teachers Retirement System pension plan, as well as the division between the two parties of the balance owed on her credit cards. However, in light of Hank's contribution of non-marital assets to reducing the debt on the marital dwelling, equity requires that he receive a greater share of the proceeds from its sale than that allotted by the chancellor. We therefore reverse and remand for a determination of the fair market value of the property and re-evaluation of Hank's equitable share.

I.

¶2. Carolyn and Hank Bullock married for the first time in 1982. The marriage broke up after two

years and Carolyn moved to Dallas. Succumbing to Hank's promises of a house on the Mississippi Gulf Coast, she moved back to Mississippi and the two remarried in 1986. While each has two grown children from previous marriages, no additional children were born to the couple.

¶3. At the time of the hearing, Hank was sixty-nine years old . He was retired from South Central Bell and drew pensions from South Central Bell, the State of Mississippi and Social Security totaling $2,576.38 per month. An avid golfer, Hank indicated that he was in good health except for an enlarged prostate and some arthritis.

¶4. Fifty-seven year old Carolyn has a Masters' Degree in education. She teaches sixth grade reading in Bay St. Louis, earning $32,000 per year. She recently had been diagnosed as suffering from high blood pressure and stress-related stomach problems. Since 1987, she has been treated for bouts of depression, melancholia and anxiety stemming from her relationship with Hank. She attempted suicide and was hospitalized at Gulf Oaks in 1987 for "a major depressive episode." The record indicates that she suffered no emotional problems prior to the marriage. Her psychologist testified that she suffered from feelings of worthlessness, helplessness and a lack of control over her life. She particularly noted Carolyn's fear of homelessness and Hank's use of that fear to control her.

The Marriage

¶5. The marriage was characterized by numerous demeaning little incidents which Hank made light of, writing everything off to Carolyn's "hysteria." Carolyn was particularly aggrieved by the sexual aspect of the couple's marriage and Hank's constant badgering and criticism. Hank, for example, apparently in response to his golf buddies' talk of their frequent sexual exploits, kept a calendar on the refrigerator door indicating when the couple had had intercourse. Hank contended that he put it up after reading a magazine article about how often people have sex and responded that he would have removed it if she had asked. Carolyn further testified:

> It was just assumed every Friday night that I would sleep with Hank. He never came to my room. I didn't sleep with him during the week because he goes to the bathroom all night and he has alcohol and he drinks in his room and he smelled so bad. But that was mutual; that was okay as long as I slept with him on Friday night. But in the last year, I man, I hated how he treated me but I hated worse me putting up with going and climbing into his bed, feeling that way. I got to where I hated myself. But you know what's so bad, if I didn't -- this is called sexual blackmail. If I didn't sleep with Hank on Saturday night, he was so ugly and hateful that I couldn't stand it so the only thing I could do was to lay down with him so he would be halfway cordial. I know that he said I ruined his social life but Hank could have, you know, cursed me out the night before and if we had guests coming over for bridge, he would put on this happy face and put his arm around me and the last year I have stopped asking people to come over to play bridge. He criticized the way I played. He wanted me to learn how -- like to watch tapes on bridge. He watched tapes on bridge but people in Diamondhead don't play like the tapes. I didn't have time to do that. I had a full time job. I had to do report cards. I couldn't study bridge. I stopped going to the bridge; I stopped that.

¶6. Hank stated that he usually only had two drinks before dinner and drank only water after dinner. Carolyn and her daughter both testified, however, that Hank drank heavily and was mean when drunk. Carolyn's daughter, Cathryn Canter, testified that when visiting her mother and Hank,

. . . it was always needling her, little things that just added up, you know, day to day basis. My mother was always in tears I mean, if we turned the air conditioner on in the summertime when it would be sweltering and you couldn't sleep at night, he would come out of his room in an alcoholic rage saying he was going to throw us out on the street if we turned the air conditioner on.

¶7. A co-worker and friend, Marilyn Center, testified that Carolyn's self-esteem had deteriorated so markedly that the school principal had asked her and several other teachers to try to help her. Center further stated that Carolyn had been in tears very frequently about the situation at home.

## Marital Assets

¶8. The couple's primary asset is the marital dwelling located at Diamondhead in Bay St. Louis, Mississippi. Hank purchased the lot on which the house is built in April, 1986, prior to the time of the remarriage for around $6,000. Through his bank in Rosedale, he obtained a construction loan for $72,000 in April or May of 1996. When his Rosedale house was sold in August, 1987, $30,345.90 of the proceeds were applied to the construction loan, reducing the debt to $42,292.73. In 1991, they bought the lot next door for approximately $3,000. The house note apparently was paid off in May, 1995. Hank contends that he kept track of the deposits made by both parties into their joint checking account as well as the checks that Carolyn had written and determined that all of the funds used to pay the house loan came from *his* money, claiming "she spent all of her money and made darned sure I didn't spend any of it."

¶9. Hank estimates that the house is valued at between $82,000 and $100,000. Carolyn testified that several years prior to the hearing, a realtor had told her that house prices in the area had increased substantially since they had built the house. She guessed that house was valued at $115,000 to $120,000.

## Non-Marital Assets

¶10. Hank's major non-marital assets include his retirement and Social Security benefits, which provide him income in the amount of $2,576,86 per month. He had a Merrill Lynch annuity, which would provide him with a quarterly income of $1,350 until 1996. Although Hank apparently made an original investment of $32,000 or $37,000 in 1986 and later withdrew part of it to pay off the loan on his Subaru, the record does not indicate the cash value of the annuity or how much he would receive when it matured.

¶11. Carolyn inherited a one-third interest in her family's thirty-three acre farm outside Cleveland, Mississippi. The record does not indicate the market value of her interest in the land, but she estimated that her interest in the rental and crop revenues totaled approximately $100 per month. She owns fifty shares of RJR Nabisco common stock, which was a gift from her daughter and son-in-law. Her September 1994 brokerage statement indicated that the stock was valued at $343.75. Carolyn and her daughter, Catherine, have a joint savings account, which was shown as having a balance of $688.68.

## Liabilities

¶12. At the time of the hearing, Carolyn had credit card debts totaling approximately $2,600. The chancellor ordered this to be divided equally between the parties. Hank's credit card bills totaled several hundred dollars. Carolyn owed approximately $15,000 on her 1991 Oldsmobile, for which the chancellor found she was responsible.

### The Divorce

¶13. In June, 1994, Hank filed for divorce on grounds of irreconcilable differences, alleging that they had separated and that Carolyn was "guilty" of habitual cruel and inhuman treatment. Carolyn answered, admitting that irreconcilable differences had arisen between the two. She sought a dismissal of Hank's complaint and filed her cross-complaint for divorce on grounds of habitual cruel and inhuman treatment. In addition, she requested temporary relief including use of the marital dwelling in Diamondhead, Mississippi, temporary support, use of the 1991 Oldsmobile titled in her name with Hank to pay the car note, insurance and maintenance, and payment of all of her medical and counseling bills. After Hank allegedly placed a long distance block on the telephone and had a taping device installed, the chancellor entered an order on October 21, 1994 awarding Carolyn temporary, exclusive use of the marital home and restraining Hank from entering the property after noon the following day. Both parties also were enjoined from encumbering, transferring or moving any assets which could be construed as marital assets and from harassing each other in any way.

¶14. A hearing was held on October 18 and 19, 1994. At the beginning of the second day of the proceedings, Hank, through his attorney, announced that he was withdrawing his petition for divorce and wanted to reconcile with Carolyn. Carolyn, however, proceeded with her cross-claim for divorce. At the close of all testimony, the chancellor overruled Hank's motion to dismiss the proceedings.

¶15. On January 19, 1995, the chancellor granted Carolyn a divorce on grounds of habitual cruel and inhuman treatment. Finding that she had made economic contributions to the couples' accumulation of wealth and had contributed to the creation of a home environment, the chancellor made an equitable division of the couple's marital assets. Finally, finding that each party had the ability to pay, the chancellor denied Carolyn's request for attorney fees and ordered court costs to be divided equally between them. The final decree was entered on April 5, 1995. Hank's motion for reconsideration was denied by the chancellor.

### II.

¶16. In his first assignment of error, Hank asserts that Carolyn failed to show that his conduct was habitual, cruel and inhuman and that the chancellor erred in granting her a divorce on those grounds. When considering whether a divorce properly was granted on grounds of habitual cruel and inhuman treatment, this Court has stated:

> In years gone by, this Court consistently held that habitual cruel and inhuman treatment could be established only by a continuing course of conduct on the part of the offending spouse which was so unkind, unfeeling or brutal as to endanger, or put one in reasonable apprehension of danger to life, limb or health, and further, that such course of conduct must be habitual, that is, done so often, or continued so long that it may reasonably be said [to be] a permanent condition.

*Wilson v. Wilson,* 547 So.2d 803, 805 (Miss. 1989). We further have noted that:

> In order to establish habitual, cruel and inhuman treatment, the evidence should prove conduct that:

> either endanger[s] life, limb, or health, or create[s] a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or in the alternative, be so unnatural and infamous as to make the marriage revolting to the offending spouse and render it impossible for that spouse to discharge the duties of the marriage, thus destroying the basis for its continuance. S. Hand, *Mississippi Divorce, Alimony and Child Custody*§ 4-12 (2d ed. Supp.1991).

*Daigle v. Daigle,* 626 So. 2d 140, 144 (Miss. 1993). More than mere unpleasantness is required for the grant of a divorce on grounds of habitual cruel and inhuman treatment. *See, e.g., Brooks v. Brooks,* 652 So. 2d at 1125 (husband could argue no more than that wife was not congenial toward him); *Ferguson v. Ferguson,* 639 So. 2d 921, 931 (Miss. 1994)(no proof that wife had "a habit of assaultive behavior or conduct" which husband reasonably feared or which adversely affected his health).

¶17. Habitual cruel and inhuman treatment may be established by a preponderance of the evidence, rather than by clear and convincing evidence. *Smith v. Smith*, 614 So.2d 394, 396 (Miss.1993). There must be corroboration of the complaining party's testimony. *Peterson v. Peterson,* 648 So. 2d 54, 57 (Miss. 1994)(citing former Miss.Unif.Chanc.Ct.R. 8.03)

¶18. Looking at Hank's actions in light of the erosion during the course of the marriage of Carolyn's mental health, and to some extent, her physical health, we find, as the chancellor stated in his decision, that Hank knew just "what buttons to push" to make her life miserable and pushed them to the limit. His behavior was more than merely unpleasant, annoying or rude. There is corroborated testimony that his drinking greatly exacerbated the situation.

¶19. The record indicates that Hank's incessant degrading and insulting behavior toward Carolyn was constant throughout their eight-year second marriage. Aside from the specific incidents Hank makes light of, there further is corroborated testimony that Carolyn became depressed during the course of the marriage and was in tears almost daily over something Hank had said or done. In addition, the record is replete with evidence that she was hospitalized at Gulf Oaks for depression and melancholia in 1987, that she had attempted suicide, went through counseling, and had bouts with hyperventilation, high blood pressure and stomach problems as a result of her unhappiness with the marriage and Hank's demeaning behavior toward her.

¶20. Given the ongoing nature of Hank's behavior, which can at the very least be characterized as unkind and unfeeling, and its impact on Carolyn's emotional and physical well-being, the chancellor properly granted her a divorce on the grounds of habitual cruel and inhuman treatment.

III.

¶21. The couple's primary asset is the marital dwelling located at Diamondhead in Bay St. Louis. They also own the adjacent lot. No recent fair market values were introduced. Hank estimates that

the house is valued at between $82,000 and $100,000, which is also the figure he testified that he paid for its construction in 1987. Carolyn testified that several years prior to the hearing, a realtor had told her that house prices in the area had increased substantially since they had built the house. Although the house had not been reappraised, Carolyn guessed that it was worth between $115,000 and $120,000.

¶22. The chancellor ordered the sale of the Diamondhead property, with the proceeds to be divided equally between the parties, "except that the husband shall receive over and above his equal share, $3,500.00 which represents the value of property prior to the building of the home." Further, Carolyn was awarded exclusive use and possession of the house until such time as it was sold. Hank asserts that the chancellor disregarded that the mortgage was reduced by $30,345 when he applied proceeds from the sale of his Rosedale house, non-marital assets, to the construction loan on the Diamondhead property and that the lot next door also was purchased prior to the marriage for $6,000. Although the record indicates that the couple had a joint checking account where Carolyn deposited her pay checks and Hank deposited his various retirement checks, he asserts that *he, at all times,* made the payments on the house and the additional lot.

¶23. Hank asserts that he is entitled to receive $36,345.90 over and above half of the proceeds from the sale of the house. As his sole authority, Hank chides the chancellor for "ignoring" the rule of *Hemsley* that "[a]ssets acquired or accumulated during the course of a marriage are subject to equitable distribution unless it can be shown by proof that such assets are attributable to one of the parties separate estates prior to the marriage or outside the marriage." 639 So. 2d at 914. In so arguing, Hank ignores those cases which have found that when non-marital assets are co-mingled with the joint marital estate to serve a familial purpose, they may lose their non-marital character. *Heigle v. Heigle,* 654 So. 2d 895, 897 (Miss. 1995); *Johnson v. Johnson,* 650 So. 2d 1281, 1286 (Miss. 1994). Thus, the proceeds from the Rosedale house applied to the note on the Diamondhead property would be subject to equitable distribution.

¶24. It is within the chancellor's authority to make an equitable division of all jointly-acquired real and personal property. *Ferguson,* 639 So. 2d 921, 929 (Miss. 1994); *Hemsley v. Hemsley,* 639 So. 2d 909, 913 (Miss. 1994); *Brown v. Brown*, 574 So. 2d 688, 690 (Miss. 1990). In making an equitable division of marital property, however, the chancellor is not required to divide the property equally. *Love*, 687 So. 2d at 2132; *Trovato v. Trovato*, 649 So.2d 815, 817-18 (Miss.1995); *Davis v. Davis*, 638 So.2d 1288, 1292 (Miss.1994); *Dudley v. Light*, 586 So.2d 155, 161 (Miss.1991); *Brown v. Brown*, 574 So.2d 688, 691 (Miss.1990). Instead, he must consider the guidelines for equitable distribution, as set forth in *Ferguson*, which include: "(1) economic and domestic contributions by each party to the marriage, (2) expenditures and disposal of the marital assets by each party, (3) the market value and emotional value of the marital assets, (4) the value of the nonmarital property, (5) tax, economic, contractual, and legal consequences of the distribution, (6) elimination of alimony and other future frictional contact between the parties, (7) the income and earning capacity of each party, and (8) any other relevant factor that should be considered in making an equitable distribution." *[Love v. Love,](687 So. 2d 1229, 1231-1232 (Miss. 1997))*. We will not reverse a chancellor's equitable division of marital property absent a finding that his decision was manifestly wrong or unsupported by substantial, credible evidence. *Sarver v. Sarver,* 687 So. 2d 749 (Miss. 1997); *Maslowski v. Maslowski*, 655 So. 2d 18, 20 (Miss. 1995).

¶25. The chancellor, as he must, considered the non-marital assets and the debt of the parties when dividing the marital assets. However, looking at factors such as the relatively short duration of the marriage, Carolyn's income and both parties' non-marital assets, the chancellor, in his effort to leave the parties equally situated, went too far in ordering, in effect, an equal division of the house proceeds. He acknowledged Hank's contribution of originally non-marital assets by awarding him $3,500 over and above half the sale proceeds. Equity demands that Hank is entitled to more. We therefore reverse the chancellor's findings and remand for determination of a *current* fair market value of the house, if it has not been sold, and further consideration of what additional part of the proceeds Hank may be entitled to receive. *See **Heigle,*** 654 So. 2d at 898; ***Ferguson,*** 639 So. 2d at 929 (fair market value of assets should be determined as initial step in marital property division).

IV.

¶26. Asserting that Carolyn "*clearly* got more than her fair share," Hank next challenges the chancellor's division of various assets. Looking at each individual aspect of the award at issue, we are reminded that the goal of equitably distributing marital property is "not only a fair division based upon the facts of the case, but also an attempt to finalize the division of assets and conclude the parties' legal relationship, leaving them each in a self-sufficient state, where the facts and circumstances permit total dissolution." ***Ferguson***, 639 So. 2d at 929.

¶27. Carolyn is a teacher in the Bay St. Louis Public School System and as such, participates in the State Retirement Program. Twenty-five years of service is necessary to become fully vested in the program. After the parties' first marriage ended, Carolyn withdrew the nine and one-half years of retirement savings she had accumulated and moved to Texas. At the time of the hearing, she again had been teaching in the Mississippi school system for seven and one-half years. She had accumulated approximately $16,000 in her retirement plan while teaching in Bay St. Louis, was planning to "buy back" her nine and one-half years for $14,329, and would still have to teach for an additional seven years until she was sixty-five years old to be fully vested in the program. Carolyn and Hank had determined that the best way to "buy back" her years in the retirement system would be for her to take out a life insurance policy on him. She paid a monthly premium of $193 on a Mutual Life Insurance Company of New York (MONY) policy, which, at the time of the hearing, had a cash value of approximately $13,000.

¶28. To the extent that funds in a retirement plan have accumulated during the marriage, it is marital property. ***Love,*** 687 So. 2d at 1231. However, one primary goal of equitable distribution is self-sufficiency, ***Ferguson,*** 639 So. 2d at 929. The chancellor therefore cannot be held in error for awarding Carolyn the assets that were intended to provide for her support after she retires.

¶29. Hank further claims that the chancellor erred in finding that a savings account styled Carolyn Bullock and Catherine Conway Canter with a balance of $688.68 at the time of trial was the separate property of Carolyn and her daughter. He also asserts that the chancellor should have awarded him half of the ten shares of Casino Magic common stock, valued at $59.37, which was jointly held by Carolyn and her sister, Evelyn Browning. Because Hank provides us with no authority or meaningful argument , we decline to address the merits of his assignment of error. ***Ellis v. Ellis,*** 651 So. 2d 1068, 1073 (Miss. 1995).

¶30. Hank invested $13,000 in an AARP tax-free mutual fund in 1989. He withdrew most of the

funds in 1991 to pay off the loan on his Subraru. At the time of these proceedings, the fund was worth approximately $2,500. The chancellor found it to be a marital asset and divided it equally between the parties. When considering together the parties' marital and non-marital assets, the chancellor has considerable latitude in adjusting the awards to do equity. *Ferguson,* 639 So. 2d at 927. Since the investment proceeds had been used to reduce Hank's debt, but Carolyn was still left with a $15,000 car loan, the chancellor should not be held in error for dividing the remaining monies in the fund.

## V.

¶31. Finally, Hank asserts that the chancellor erred in dividing equally between the parties some $2600 in credit card debt accumulated on Carolyn's two VISA cards. He contends that Carolyn testified that she used these accounts to purchase gifts for her family and clothing. The record indicates that Carolyn also used the credit cards to purchase a televison, sheets, and other miscellaneous household goods for the marital dwelling, and to pay for two nights in a hotel when Hank locked her out of the house. Hank cites as his only authority *Nichols v. Nichols*, 254 So. 2d 726 (Miss 1971) for the proposition that when determining the amount of *alimony* to be paid, "consideration must be given to the rights of the other party to lead as normal a life as reasonably possible with a decent standard of living." The liabilities as well as the assets of the parties must be taken into consideration when the chancellor effects an equitable distribution of marital and any other relief that may be appropriate such as alimony or child support. *Gambrell v. Gambrell,* 650 So. 2d 517, 522 (Miss. 1995). Here, where there is testimony that the debt incurred was used to make purchases for the marital dwelling as well as to pay for a hotel as a result of Hank's actions, we do not find the chancellor's decision to have been manifestly wrong or contrary to the evidence.

## VI.

¶32. The record supports the chancellor's finding that Carolyn is entitled to a divorce on grounds of habitual cruel and inhuman treatment. In making an equitable distribution of the couple's marital property, however, Hank should have been allowed more than $3,500 over half of the sale price of the marital dwelling, since more than $30,000 of originally non-marital assets were used to reduce the amount of the construction loan. We therefore reverse and remand for further proceedings consistent with this opinion on this issue. Because the chancellor otherwise fairly balanced the equities and made every effort to leave each of the parties self-sufficient, we find no merits to the remaining issues Hank has raised.

¶33. **REVERSED AND REMANDED.**

**LEE, C.J., SULLIVAN, P.J., PITTMAN, BANKS AND SMITH, JJ., CONCUR. PRATHER, P.J, DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY ROBERTS AND MILLS, JJ.**

**PRATHER, PRESIDING JUSTICE, DISSENTING:**

¶34. Because the chancellor's distribution of marital property in this case was equitable and was supported by substantial evidence, I respectfully dissent. The judgment of the chancellor should be affirmed.

¶35. The majority would remand this case for an appraisal of the marital dwelling. Although an appraisal is very helpful and frequently necessary in order to equitably divide property, such is not the case here. *See **Sandlin v. Sandlin**, No. 94-CA-01293, (Miss. March 27, 1997),* slip op. at 6 (The chancellor may rely on parties' estimates in determining value of marital property, assuming that neither party lied or was mistaken as to the value of the assets.)

¶36. In the case *sub judice*, the chancellor awarded the wife fifty percent of the proceeds from the sale of the home minus $3,500, and the husband fifty percent of the proceeds plus $3,500. Considering the distribution of the remaining property, $3,500 was the amount the chancellor ruled necessary to balance the equities between the parties. Otherwise, the amount of money received from the proceeds of the sale of the house was the same for both parties.

¶37. Therefore, the real issue in this case is not the fair market value of the house; rather, the issue is whether the $3,500 award to the husband was equitable, given the distribution of the other marital property. An appraisal is not necessary to answer that question. This Court need only consider the chancellor's distribution of the marital assets as a whole, in the light of the guidelines set forth in *Ferguson v. Ferguson*, 639 So. 2d 921, 929 (Miss. 1995). Our scope of review in domestic relations matters is limited by our familiar substantial evidence/manifest error rule.

> This Court will not disturb the findings of a Chancellor unless the Chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied.

> In other words, on appeal we are required to respect the findings of fact made by a chancellor supported by credible evidence and not manifestly wrong. If we find substantial evidence supporting the chancellor's fact findings, they are beyond our power to disturb.

*Parker v. Parker*, 641 So. 2d 1133, 1137 (Miss. 1994) (citations and quotation marks omitted). The chancellor's distribution of the property in this case was equitable and it was supported by substantial evidence. Therefore, I would affirm.

¶38. The wife in this case left her job and dwelling in Texas to re-marry the husband. Although he contributed greatly to the purchase price of the marital home, she also worked and contributed to the income and to the environment of the household. In addition, the funds spent by the husband on the purchase of the marital home were co-mingled with the marital assets and were used for the benefit of the family. Therefore, (absent an agreement to the contrary) those funds became marital property and were properly subject to equitable distribution, along with the other marital assets. *Johnson v. Johnson*, 650 So. 2d 1281, 1286 (Miss. 1994).

¶39. Furthermore, the husband's income was greater than that of the wife. The husband owed nothing on his vehicle, and the wife owed approximately $13,000 on hers. Neither party was granted attorney

fees. No alimony was awarded in this case.

¶40. Thus, considering the facts of this case in the light of the guidelines set forth in *Ferguson*, there is no evidence that the chancellor committed manifest error in dividing the property. *See Ferguson*, 639 So. 2d at 929. This is particularly true, given the separate estates of the parties and the fact that no alimony was awarded.

¶41. In addition, where a case is remanded for further examination of property division by the chancellor, the entire case should be reconsidered -- not just the value of one piece of property. That is, the chancellor should not be asked to divide the proceeds from the sale of the marital home in a vacuum, but should be allowed to consider all the pertinent facts. On remand, the chancellor "may adjust his awards to do equity, and has considerable latitude in doing so." *Johnson*, 650 So. 2d at 1287. As stated earlier, however, it is my view that the chancellor has already considered the relevant facts and law and made an appropriate ruling thereon.

¶42. Finally, I do not fully agree with the following language in the majority opinion: "To the extent that funds in a retirement plan have accumulated during the marriage, it is marital property." The majority cites *Love v. Love*, 687 So. 2d 1229, 1231 (Miss. 1997). However, in the *Love* case, some of the retirement funds were actually accumulated prior to the marriage. Nonetheless, the couple planned for the use of the retirement account, such that it became marital property. *See Id.* Thus, to the extent that the majority opinion implies that retirement funds can be considered marital property *only* when accumulated during the marriage, I disagree. For all these reasons, I dissent and would affirm.

**ROBERTS AND MILLS, JJ., JOIN THIS OPINION.**