55 So.3d 1097 (2010)
David Hardin DOYLE, Appellant
v.
Karen Phyliss DOYLE, Appellee.
David Hardin Doyle, Appellant
v.
Karen Phyliss Doyle, Appellee.
Nos. 2007-CP-01925-COA, 2008-CP-01927-COA.
Court of Appeals of Mississippi.
August 17, 2010.
Rehearing Denied November 23, 2010.
Certiorari Denied March 10, 2011.
*1101 David Hardin Doyle, appellant, pro se.
James D. Minor, Oxford, attorney for appellee.
Before KING, C.J., BARNES and MAXWELL, JJ.
BARNES, J., for the Court:
¶ 1. The Chancery Court of DeSoto County granted Karen Doyle a divorce from David Doyle on the ground of habitual cruel and inhuman treatment and made certain determinations regarding the distribution of marital property. When David failed to perform the actions ordered by the divorce decree, the chancery court granted Karen's motion for citation of contempt. David appeals both the judgment regarding the property division and the final order of contempt, raising several issues on each matter. The two appeals were subsequently consolidated. Finding no error in either judgment, we affirm.

STATEMENT OF FACTS AND PROCEDURAL HISTORY
¶ 2. David and Karen were married in November 2003. No children were born of *1102 the marriage. David worked as a counselor for the small business center at Southwest Tennessee Community College in Memphis, Tennessee, and Karen was a homemaker who ran a fragrance-products business, Adam's Ant Imports, out of the marital home. Karen testified that David also wrote business plans for small businesses, charging $2,500 for each plan. Karen also received social-security benefits for a disability. When they separated in January 2006, the couple resided in the marital home in Olive Branch, Mississippi.
¶ 3. David filed for divorce based on habitual cruel and inhuman treatment and irreconcilable differences. He requested ownership of the marital home and its furnishings and equitable division of certain marital property. Karen filed a counter-complaint for divorce on the grounds of habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences. She requested alimony, certain marital property, and attorney's fees.
¶ 4. Two hearings were held on the matter in May and August 2007, respectively. On August 2007, the chancellor issued a ruling from the bench granting Karen a divorce based on habitual cruel and inhuman treatment; a decree to this effect was entered on September 24, 2007. The chancellor divided the parties' property into marital and non-marital assets. Karen's non-marital property included a residence in Memphis, an automobile, all assets from Adam's Ant Imports, and various personal property specifically listed in the decree. The chancellor ordered David to deliver these specific items to Karen's residence in Memphis within ten days of the entry of the decree. David's non-marital property included real and personal property inherited from his mother, who passed away during the marriage, and balances on all retirement accounts acquired prior to the marriage.
¶ 5. The chancellor deemed the marital home in Olive Branch a marital asset. Additionally, she found all of the household furnishings acquired by the parties subsequent to the marriage located within the marital home to be marital property, including furniture which had been destroyed by David shortly after the couple's separation. The chancellor valued this furniture at $7,000. Other marital property included a 2002 Infiniti automobile, a riding lawn mower the court valued at $3,000, a 2005 federal income tax refund, and David's retirement account related to his employment at the community college, and any appreciation of other retirement accounts owned by him prior to the marriage.
¶ 6. Addressing the Ferguson factors for equitable distribution of the marital assets, the chancellor found that while David had a larger income than Karen during the marriage, Karen contributed equally as a homemaker and through her social security disability benefits. Also, testimony showed Karen's business produced approximately $20,000 per year in income. The chancellor did not find that there had been any distribution of the marital assets, with the exception of the destroyed marital furniture. The chancellor explained that she was attempting to make a distribution that minimized tax consequences, periodic payments, and other potential sources of friction between the parties. She also acknowledged that the testimony by the parties on various matters was so "far apart" that there were obviously some "blatant lies" made by both parties.
¶ 7. After fully addressing each Ferguson factor, the chancellor divided the marital property. The marital residence in Olive Branch was to be sold, with each party receiving one-half equity from its sale. David was awarded the 2002 Infiniti automobile and any debt related to it. *1103 The court awarded Karen $2,500, which represented one-half of the equity in the 2002 Infiniti. Karen was awarded $7,500 of David's retirement accounts, which included her share of the community college fund and any appreciation of other retirement accounts subsequent to the marriage. The chancellor stated David could either pay this amount to Karen in a lump-sum payment or through a Qualified Domestic Relations Order (QDRO). The court also awarded Karen the full value of the marital furnishings (both destroyed and remaining), or $7,000, and $300 as compensation for furniture belonging to her grandchild that was also destroyed by David. David was ordered to provide copies of the 2005 federal income tax return and pay Karen fifty percent of the refund. Finally, Karen received $1,000 for equity in the marital lawn mower. All of the payments were ordered to be made within thirty days from the entry of the decree.
¶ 8. Further, the court found that more than $30,000 on Karen's credit cards was marital debt and that David should reimburse Karen $15,000, either as a lump-sum payment within thirty days of the entry of the decree or at a rate of $1,500 per month until paid. The court also ordered David to continue to provide Karen with health insurance for one year either through their current policy or through COBRA. The chancellor fully addressed the Armstrong factors for alimony. Neither party was awarded alimony, and both parties were responsible for their own attorney's fees. David timely filed his appeal of this judgment.
¶ 9. In January 2008, Karen filed a motion for citation of contempt, as David had not complied with the September 2007 decree and had appealed without requesting a supersedes bond. Karen contended that David had failed to perform any of the financial obligations ordered, had not delivered the non-marital personal property, and had made no effort to put the marital home on the market. She also requested related expenses and fees for the contempt matter. After a hearing on the motion, the chancellor entered a writ of assistance in order for Karen to obtain her possessions from the marital household which David had not returned to her. Additionally, the chancellor granted Karen's motion, finding David in willful contempt of the September 2007 divorce decree.
¶ 10. Also, determining that David had sufficient means to pay the sums previously ordered at the time of the decree, the chancellor ordered David to report to the court three days later, and if he had not paid the sum of $28,552 by that date, plus one-half of the income tax refund, and provided health insurance for Karen, he would be incarcerated in the DeSoto County Jail. David was also to continue to try and sell the marital home as previously ordered and report his progress to the court in June 2007.
¶ 11. When David reported to the court on March 7, 2008, the chancellor found that he still had not made a good-faith effort to comply with the court's prior orders; so she ordered him incarcerated. Further, the chancellor ordered David to pay all of Karen's reasonable and necessary medical expenses for twelve months beginning in March 2008, for one year, in lieu of providing her health insurance. Other matters, such as Karen's reimbursement for certain personal items in the writ of assistance, which were not returned by David, and fees and expenses for the motion for contempt, were taken under advisement by the court.
¶ 12. Approximately ten days later, the chancellor ordered David released from jail, as he had paid $15,000 on the judgment. He was ordered to report to the court in May 2008 to assess his compliance *1104 with the other provisions of the court's orders and to pay the balance of his arrearage. On October 21, 2008, the chancery court entered an order nunc pro tunc to August 27, 2008, finding: the remainder of David's share of the credit-card balance, $6,000, was due; Karen should be awarded a judgment of $3,000 for clothing and personal property not returned to her by David, as well as a judgment of $3,000 as reimbursement for her attorney's fees for this proceeding; and since David did not obtain health insurance for Karen, he was ordered to pay Karen $4,559.40, which represents the yearly premium for a health-insurance plan Karen presented to the court. Therefore, Karen was awarded a judgment of $16,559.40 by this order, plus the $28,552 found to be owing from the March 7 order, totaling $45,111.40. However, since March 7, the court found David had paid a total of $21,500, leaving a balance of $24,111.40,[1] which David was ordered to pay. Additionally, the chancellor found David in contempt for not having made a good-faith effort to list the marital house for sale; therefore, the chancellor ordered that the house be listed for sale with a real-estate agency immediately. Lastly, David was ordered to transfer $7,500 by a QDRO as previously directed, with the total balance due on the judgment reduced by this amount. David timely filed his appeal of the October 2008 order.[2]

ANALYSIS
¶ 13. This appeal is a consolidation of two matters: property distribution and contempt of court; therefore, we shall discuss each matter separately.

I. Property Distribution
¶ 14. David contests several of the chancellor's determinations regarding the distribution of the marital property. David contends the chancery court erred by failing to apply the Ferguson factors properly. We shall discuss each of his contentions in turn.
¶ 15. This Court's standard of review is extremely limited as to property division and distribution in divorce cases. Bowen v. Bowen, 982 So.2d 385, 394 (¶ 32) (Miss.2008). It is well established that "the chancellor's division and distribution will be upheld if it is supported by substantial credible evidence." Id. However, this Court will reverse the chancellor's decision if it is found to be "manifestly wrong, or that the court applied an erroneous legal standard." Id. at (¶ 33).
¶ 16. The first step in equitable distribution of marital property is for the chancellor to determine whether the parties' assets are marital or non-marital. Hemsley v. Hemsley, 639 So.2d 909, 914 (Miss.1994). Assets accumulated during the marriage are considered marital assets and are subject to equitable distribution by the chancellor. Stewart v. Stewart, 864 So.2d 934, 937 (¶ 12) (Miss.2003). For divorce purposes, economic, domestic, or other contributions and efforts of the marital partners is of equal value. Id. Further, separate property that commingles with the joint marital estate will become marital property subject to equitable distribution. Johnson v. Johnson, 650 So.2d 1281, 1286 (Miss.1994). Non-marital assets, such as *1105 inheritances, can become converted into marital assets if they are commingled with marital property or utilized for domestic purposes. Boutwell v. Boutwell, 829 So.2d 1216, 1220 (¶ 14) (Miss.2002).
¶ 17. The second step is for the chancellor to divide equitably the marital assets according to the factors set out by the supreme court in Ferguson v. Ferguson, 639 So.2d 921, 928 (Miss.1994). These factors are:
1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
a. Direct or indirect economic contribution to the acquisition of the property;
b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and
c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.
2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.
3. The market value and the emotional value of the assets subject to distribution.
4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;
5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;
6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;
7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,
8. Any other factor which in equity should be considered.
Id. The chancellor need not make findings regarding each Ferguson factor but may consider only those factors "applicable" to the property in question. Sproles v. Sproles, 782 So.2d 742, 748 (¶ 25) (Miss. 2001) (citing Weathersby v. Weathersby, 693 So.2d 1348, 1354 (Miss.1997)).
¶ 18. We find that the chancellor properly considered and applied the Ferguson factors to each of the following contested rulings.

A. Automobile
¶ 19. David first argues that the chancellor erred in awarding Karen $2,500 for equity in the 2002 Infiniti automobile, which was classified as marital property. The automobile was purchased during the marriage and registered in both parties' names. The chancellor ruled that David would receive possession of the vehicle, but Karen would receive half of the equity in it. David, however, complained that the chancellor ignored his testimony that his 8.05 financial statement was inaccurate due to a typographical error omitting a minus sign, and there was not actually $5,000 in equity in the vehicle, but a $5,000 deficit.
¶ 20. We note that David's 8.05 statement shows the value of the vehicle at $23,000 and the loan balance at $28,000, which could indicate a $5,000 deficit. *1106 However, David's 8.05 statement, which he executed under oath, clearly reports that there is $5,000 in equity in the automobile, and Karen testified this was correct. The automobile's value of $23,000 is listed as an "estimate." Further, there was no third-party documentation presented during the proceedings to show what the equity or value of the automobile was, that the 8.05 statement was incorrect, and that there was a $5,000 deficit on the automobile loan. David provides no Kelley Blue Book value for the automobile or documentation on the balance of the loan. David makes reference to an "amended" 8.05 statement, which corrected the error, but there is no such document in the record before us. This Court may not act upon statements in briefs or arguments that are not reflected in the record, but we must confine ourselves to what is contained in the record. Shelton v. Kindred, 279 So.2d 642, 644 (Miss.1973).
¶ 21. In making her ruling, the chancellor did not ignore David's testimony that the 8.05 statement was incorrect, but she explained that the information the parties provided was all she had to refer to, even if it was inaccurate. While there was obviously some error on the face of David's 8.05 statement concerning the automobile, the error could have been in the automobile's estimated value at $23,000 rather than the amount of equity. Karen testified that half the equity in the vehicle totaled $2,500. While it would have been preferable for the parties to have presented documentary evidence to support their estimates of the value of the automobile, we cannot find that the chancellor erred in accepting Karen's testimony on this disputed issue of fact. Accordingly, we affirm.

B. Furniture
¶ 22. Next, David contests the chancellor's award of $7,300 to Karen for her share of the marital furniture. David admitted that he had destroyed the marital furniture by slashing gashes in upholstery and carving his initials and name in wooden pieces in order to force Karen to leave the marital home in January 2006. Karen entered photographic evidence of the destroyed furniture as well. During the incident, the police were called to the marital home, and David was arrested for domestic disturbance. The chancellor awarded Karen $7,000 for the marital furniture and $300 for her grandchild's baby furniture, which was at the marital home and destroyed by David.
¶ 23. David testified that the value of the marital furniture was approximately $6,000 to $7,000, while Karen testified it had a "replacement value" of $20,000. A receipt was entered into evidence showing that Karen had purchased the furniture at an outlet store in October 2004 for $2,800, and it had a retail value of approximately $4,200 at that time. Karen testified that the furniture is no longer manufactured by Lane, so it cannot be replaced; however, she contended that to purchase furniture with comparable leather, the sectional alone would cost $6,500. David claims the furniture was delivered to Karen's residence in Memphis and not the marital home; however, there is no evidence in the record supporting this claim. Karen also testified that it cost her $300 to replace the grandchild's furniture. We find no error in the chancellor's determination that David purposefully destroyed marital assets and, thus, Karen should be awarded $7,000 in order to replace the marital furniture and $300 for her grandchild's furniture.
¶ 24. Although David does not raise this as a separate issue but includes it in his argument on the furniture, David claims that the chancellor ignored his testimony that Karen fraudulently obtained the *1107 proceeds of the sale of his deceased mother's home of approximately $79,000 and deposited it in her Adam's Ant account to pay off credit-card debt and purchase the abovementioned furniture. He argues that the chancellor should have taken this conduct into account regarding the furniture. We find this argument without merit as well.
¶ 25. It is true that David introduced evidence that Karen endorsed the $79,000 check and also signed David's name on it and deposited it in the Adam's Ant account in October 2005. Karen contends that when David's mother passed away in August 2005, David inherited $100,000 in CDs which he "cashed in," and a house, for which he received $82,000. The $79,000 check came from the sale of the house. Karen stated that she deposited it in the joint Adam's Ant account, and since David is president of that company, the funds were commingled and, thus, marital.
¶ 26. The chancellor rejected Karen's contention, as do we. Because David immediately obtained a "stop-payment" on the check once he realized Karen had deposited it in the Adam's Ant account, requested a replacement check, and deposited it in his personal account, the inheritance funds were not commingled with marital funds; thus, they were not marital property. However, we find no evidence in the record that Karen purchased the furniture with David's inheritance funds and, thus, "defrauded" him. We find no error with the chancellor's ruling on either the furniture or David's inheritance funds.

C. Lawn Mower
¶ 27. David argues that the chancellor erred in awarding Karen $1,000 in equity for the lawn mower. He claims the mower, which he valued at $3,000 on his 8.05 statement, was financed solely by him and, thus, is not marital property, as Karen had her own lawn mower for her separate residence in Memphis, which was listed on her 8.05 statement. David testified that he purchased the mower in April 2006, after the parties separated, but before they divorced.
¶ 28. While there was no testimony about whether the subject lawn mower was used at the marital home, it was purchased when the parties were still married, and David's only residence was the marital home. The supreme court has held that "[a] spouse who has made a material contribution toward the acquisition of property which is titled in the name of the other may claim an equitable interest in such jointly accumulated property incident to a divorce proceeding." Ferguson, 639 So.2d at 935 (quoting Jones v. Jones, 532 So.2d 574, 580 (Miss.1988)). We find substantial evidence in the record to indicate that the lawn mower was marital property. Therefore, we find no error with the chancellor's ruling on the lawn mower.

D. Credit-Card Debt
¶ 29. Next, David argues that the chancellor erred in ordering him to pay Karen $15,000 for credit-card debt. The chancellor found more than $30,000 of marital debt was incurred on Karen's credit cards and ordered David to pay half of it. David claims the evidence in the record is misleading  Karen's credit-card debt was not marital debt but was in the name of her business, and once married, she transferred the debt to her personal name. He now complains that no receipts were entered into evidence showing the types of charges made to her credit cards, and if there had been, the court would have discovered the charges were not marital debt.
¶ 30. At the divorce hearing, David admitted that while he did not know where Karen's credit-card debt came from, it did *1108 arise during the course of the marriage. David claimed that some of the debt originated from Karen's putting her relatives' and son's bills on her credit cards. He also claimed that she moved balances around so it was impossible to distinguish what debt was marital and non-marital. David, however, did not provide the chancery court with any documentary evidence to support his contentions.
¶ 31. Karen introduced her credit report from 2003, before she and David married, which showed an insignificant amount of credit-card debt. At the time of the divorce hearing, she testified that there was $98,000 in credit-card debt  $40,000 was debt incurred during the marriage because David insisted she pay the shortfall of their monthly budget with her credit cards since she had good credit. Karen also claimed she incurred $48,000 in debt to maintain her everyday needs since the couple had separated. Additionally, Karen testified she made a total of $46,700 in credit-card payments by borrowing against other credit cards. She requested David reimburse her for half of this sum, or approximately $23,350.
¶ 32. There was substantial evidence introduced that the charges on Karen's credit cards were for marital expenses, such as bills, and David did not present any evidence to refute it. The supreme court and this Court have upheld similar rulings where separately held credit-card balances were included in the equitable distribution of marital debt even when one spouse had not made regular payments, but the charges were for goods for the marital dwelling. See Bullock v. Bullock, 699 So.2d 1205, 1212 (¶ 31) (Miss.1997); Prescott v. Prescott, 736 So.2d 409, 418 (¶ 48) (Miss.Ct.App.1999). Similarly, here, Karen testified that the debt was for payment of household bills, at the direction of David. Accordingly, we find no error in the chancellor's ruling on the credit-card debt.

E. Income-Tax Refund
¶ 33. David argues the chancellor erred in requiring him to pay fifty percent of the 2005 federal income-tax refund. He notes it was filed "married filing single," and no deductions were taken for Karen or her assets. Also, while a deduction was taken for the marital home, David claims that the mortgage was only in his name and that he made all the payments. Karen testified she thought she was entitled to half of the refund because in 2005 she was contributing to the household income and paying bills with her credit cards. The chancellor found the refund was a marital asset; thus, Karen should be entitled to half of it. We find no error.

F. Health Insurance
¶ 34. David disagreed with the chancellor's ruling that he should have to provide Karen with health insurance for one year. He claims that since Karen receives social-security benefits, she is eligible for Tenn-Care medical benefits, a state health-insurance plan in Tennessee, which would provide better benefits than he could. He contends the chancellor's ruling is punitive, redundant, and amounts to a redistribution of non-marital assets.
¶ 35. Proof was introduced that Karen was receiving social-security benefits at the time of the divorce hearings. Additionally, she testified she had recently had an abnormal mammogram. Because of the disparity in the parties' income and Karen's health issues, the chancellor ruled that while she normally did not make an alimony award at the end of such a short marriage, here she would require David to provide Karen with health insurance for one year either through the same marital policy, COBRA, or a substantially similar policy. At the contempt hearing, Karen *1109 explained that she had not been eligible for Tenn-Care while married to David because she was under his employer's policy. We note the chancellor's decree did not specify which carrier provided Karen health insurance, but David was to provide it, not Karen. We find no error in the chancellor's ruling regarding Karen's health insurance. Additionally, we find no merit to David's argument that this ruling is a redistribution of non-marital assets.

G. Marital Residence
¶ 36. David's next argument is that the chancellor erred in ordering him to sell the marital residence and pay one-half of the equity to Karen. He requested exclusive possession and ownership of the marital home in his complaint for divorce. On appeal, David reasoned that because of the poor real-estate market, the value of the house had declined below the purchase price, from approximately $400,000 to $395,000. Further, he claimed that $398,000 is owed on the mortgage; thus, it would actually cost both parties approximately $10,000 to sell the house with real-estate fees, but excluding closing costs. David also notes Karen's name is not on the mortgage. He further complains that he was not awarded any equity in Karen's residence in Memphis, where he had made significant home improvements.
¶ 37. Testimony showed David and Karen purchased the marital home in Olive Branch in November 2004, after they had been married one year. Both of the parties have lived at the marital home. The property's deed was not entered into evidence, but David introduced an appraisal dated June 2007 he obtained, which showed the property's "market value" was $395,000. David added that many of the homes in the neighborhood were in foreclosure. Karen estimated that the houses in the neighborhood were valued between $350,000 to $600,000, and their residence's value was approximately $450,000, with $40,000 to $50,000 in equity. Karen did not list the home as an asset on her 8.05 statement, but requested half of the equity at the divorce hearing. David's 8.05 statement, dated May 2006, valued the home at approximately $419,000, with $20,000 in equity.
¶ 38. The chancellor stated that because of the various figures given about the value of the marital residence and its equity, the parties would place the residence on the market immediately and split any proceeds equally. The chancellor also found that Karen's residence in Memphis was not marital property as it had been acquired before the marriage, and even though David lived there briefly while they were married, Karen alone continued to pay the mortgage, taxes, and insurance on the home with her social-security benefits. We find substantial evidence to support the chancellor's ruling regarding the marital home.

H. David's Retirement Accounts
¶ 39. David argues the chancellor erred in awarding Karen $7,500 in equity in his Southwest Tennessee Community College retirement account. David contends that Karen is not entitled to these funds as they were married only a short time, and she has her own retirement benefits through social security. He also asserts that the chancellor's award was not precisely calculated.
¶ 40. David did not list any retirement accounts on his 8.05 statement, but at the divorce hearing, he admitted that he had two retirement accounts. He testified to approximately $23,000 in his Southwest Community College retirement account at the time of the divorce hearing, with approximately $13,500 accumulated during the marriage. Additionally, he had approximately $18,000 in another retirement account. Further, David testified he was *1110 scheduled to begin receiving $4,000 per month in two years from his military pension. The chancellor explained she was awarding Karen $7,500 of the community college retirement account, which was a little over half of what David testified accumulated during the marriage, in order to offset any increase in appreciation during the marriage of the other non-marital account.
¶ 41. We find no error with this ruling. It is well established that retirement funds accumulated during the marriage are personal property subject to division at divorce. Brown v. Brown, 574 So.2d 688, 690 (Miss.1990). Additionally, it has long been recognized, in relation to retirement funds and pensions, that the chancery court has the "authority, where the equities so suggest, to order a fair division of property accumulated through the joint contributions and efforts of the parties." Id. However, spouses will not be automatically entitled to an equal division of jointly accumulated property. Id. at 691 (citing Dillon v. Dillon, 498 So.2d 328, 330 (Miss.1986)). Instead, it is at the chancellor's discretion, taking into account equities, relevant facts, and circumstances. Id.
¶ 42. Here, the chancellor found that David's and Karen's contributions to the marriage were equal, even though Karen was a homemaker and David made substantially more income than Karen. While their marriage was short, the chancellor only awarded Karen a portion of David's retirement accounts that had accumulated during the marriage. The chancellor did not abuse her discretion. This issue is without merit.

II. David's Contempt
¶ 43. Next, David raises four issues regarding the contempt proceedings. We shall discuss each issue in turn.
¶ 44. "Contempt matters are committed to the sound discretion of the trial court." Weston v. Mounts, 789 So.2d 822, 826 (¶ 17) (Miss.Ct.App.2001) (citing Caldwell v. Caldwell, 579 So.2d 543, 545 (Miss.1991)). The reviewing court will not reverse the chancellor's findings if they are supported by substantial credible evidence. Id. A citation for contempt is proper when "the contemner has willfully and deliberately ignored the order or the court." Id. at 826-27 (quoting Bredemeier v. Jackson, 689 So.2d 770, 777 (Miss.1997)). This Court will defer to the chancellor's ability to view the witnesses, determine their credibility, and review the exhibits before the chancery court. Stribling v. Stribling, 960 So.2d 556, 559 (¶ 7) (Miss.Ct. App.2007) (citing Wesson v. Wesson, 818 So.2d 1272, 1279 (¶ 20) (Miss.Ct.App. 2002)). The Court will only interfere with the chancellor's findings of fact if we are convinced that the chancellor substantially abused her discretion. Ewing v. Ewing, 749 So.2d 223, 224-25 (¶ 5) (Miss.Ct.App. 1999) (citing Rakestraw v. Rakestraw, 717 So.2d 1284, 1287 (¶ 9) (Miss.Ct.App.1998)).

A. Finding of Contempt
¶ 45. David claims the chancellor erred in finding him in willful contempt of court in the October 21, 2008, order. He argues that he attempted to comply with the court's divorce decree as best he could, but he did not have the funds to pay the judgment; and it was impossible for him to provide Karen with health insurance because she was no longer his wife. He concludes that he was unable to perform the court's demands due to circumstances beyond his control.
¶ 46. The purpose of a civil contempt order is to coerce a parties' compliance with a court order. Moulds v. Bradley, 791 So.2d 220, 224 (¶ 6) (Miss. *1111 2001) (quoting Newell v. Hinton, 556 So.2d 1037, 1044 (Miss.1990)). A payor's failure to comply with a court order is prima facie evidence of contempt. See Rainwater v. Rainwater, 236 Miss. 412, 421, 110 So.2d 608, 611 (1959) (husband's failure to pay alimony was prima facie evidence of contempt). The burden then shifts to the defendant who may rebut the prima facie case by proving inability to pay, lack of willfullness regarding the contempt, ambiguity in the order's provisions, or impossibility of performance. Deborah H. Bell, Bell on Mississippi Family Law § 11.05 (1st ed. 2005). Civil contempt, such as here, must be proven by clear and convincing evidence. Allred v. Allred, 735 So.2d 1064, 1067 (¶ 10) (Miss.Ct.App.1999) (citing Masonite Corp. v. Int'l Woodworkers of Am., 206 So.2d 171, 180 (Miss.1967)).
¶ 47. First, David argues on appeal that he was unable to pay the judgment. It is well established that the payor must prove the inability to pay with "peculiarity" and not in general terms. Morreale v. Morreale, 646 So.2d 1264, 1267 (Miss.1994) (quoting Clements v. Young, 481 So.2d 263, 271 (Miss.1985)). David claims he provided the chancellor at the second contempt hearing on March 7, 2008, with copies of his bank statements and other financial statements that prove his inability to pay the divorce decree judgment. However, we find no merit to David's contentions.
¶ 48. At the March 4, 2008, contempt hearing, when David was asked why he did not pay the various judgments, he merely stated repeatedly that he "didn't have the money" to each query. He offered no particular proof of why he did not have the funds. The only documents entered into evidence at the first contempt hearing were his 2005 income-tax return (to confirm he had a refund of approximately $2,500); his original 8.05 statement, dated May 26, 2006, which was entered into evidence at the original divorce hearing; and a "new" 8.05 statement dated March 3, 2008. In the original 8.05 statement, David reported $37,000 in a savings account as a "non-marital asset," which was presumably the remains of his inheritance from his mother's estate. He also reported a net monthly income of $3,850.24, and monthly living expenses of $6,474. At the contempt hearing, David testified that at the time of the divorce hearing, he had debt totaling $42,000, not including the mortgage on the marital home and the Infiniti automobile payment. In his new 8.05 statement, he claimed a monthly net income of $4,111, total monthly expenses of $6,028, monthly installment payments for various credit cards and loans of $1,147, and only $235 remaining in his savings account. In his brief, David stated that his $37,000 in savings had been "depleted" over time but did not elaborate at the contempt hearings on how. Further, the bank statements entered into evidence do not indicate how the funds were spent. David also reported that he now owned five acres of property valued at $5,000 that was not on his original 8.05 statement.
¶ 49. Regarding the payment of $7,500 retirement funds, David explained that he could not access the funds until he was sixty-years old, which would be at the end of August 2008. Regarding Karen's health insurance, David maintained that before the divorce Karen was covered by both his work policy and Tenn-Care, as Karen receives social security. He claims it would have cost him $500 per month to continue his employer's coverage through COBRA, which he could not afford. In conclusion, David testified that it was impossible for him to pay the amounts set by the court, but he offered to pay $200 per month, increased to $1,000 per month once he sold *1112 the marital home or reached sixty years old and had access to an annuity.
¶ 50. The chancellor explained that she had labored carefully over the evidence and would not have ordered David to pay and perform the actions ordered if she had not believed he had the ability to do so. Further, she noted that at the divorce hearing, David had testified and provided documentation that he had $37,000 in a savings account; so he should have been able to pay the items she ordered within thirty days. The fact that David now reported only $235 in his savings account showed that he chose to spend these funds on something other than the judgment. No evidence was admitted as to how he spent these funds. In conclusion, the chancellor stated she took into consideration his ability to pay at that time of the divorce decree and his respective financial condition when she found him in willful contempt.
¶ 51. At the second contempt hearing on March 7, 2008, in which David was either to comply with the remainder of the judgment or be incarcerated, he entered into evidence his savings account report showing its available balance at the time of the last divorce hearing in September 2007 of approximately $5,000. David also admitted that he still had not provided health insurance for Karen, but she had been covered through his employer until January 2008; however, she could not apply for COBRA benefits now as it was too late. Additionally, he modified his testimony from the first contempt hearing and stated that he would not have access to his retirement funds until he retired or turned seventy years old, not sixty years old, and he did not know when he was going to retire. David proposed that he would, however, pay Karen $3,000 now, $500 per month commencing the following month, and $1,000 per month commencing in August 2008, as his employer was going to advance his salary.
¶ 52. After David's testimony, the chancellor questioned him, eliciting the following responses. David had not attempted to borrow funds to satisfy the judgment, as he was "tapped out credit wise." He blamed his attorney for not completing the QDRO to transfer $7,500 of his retirement account over to Karen. Further, he did not advise Karen that she only had sixty days from January 2008 to apply for COBRA benefits. Additionally, the $5,000 from his savings account had been spent. The $5,000 tract of land was inherited, and David contended he could not sell it as he was merely a co-owner with other family members. Finally, he maintained he did not possess any of Karen's property listed on the writ of assistance.
¶ 53. The chancellor ruled that since David had not come to the hearing with even "one penny" to pay the judgment, he was ordered incarcerated.
¶ 54. We find no error in the chancellor's ruling of willful contempt of court, and no merit to David's argument that he could not satisfy the judgment due to circumstances beyond his control. David did not appeal the divorce decree with a supersedes bond; he merely took it upon himself to stay the action by not performing. The decree specifically stated that most of its actions were to occur within thirty days of its entry. We also note, as the chancellor did, that David made no attempt to pay a portion of the judgment or attempt to borrow funds to pay it.
¶ 55. Further, not all of the matters of contempt involved payment of funds, but David did not comply with these orders either. David did not return some of Karen's non-marital personal property listed in the divorce decree, and what he did return was returned five months after the *1113 judgment, instead of within the ten days decreed.
¶ 56. We find substantial evidence in the record to support the chancellor's findings of contempt of court.

B. Health Insurance
¶ 57. David next argues that the chancellor erred in ordering him to pay $4,559.40 to cover Karen's health-insurance premium for one year in the October 2008 order. The original divorce decree of September 24, 2007, ordered David to provide health insurance to Karen for one year subsequent to the entry of the order, or until September 24, 2008, but David did not comply. As David noted, the chancellor made a ruling from the bench on March 7, 2008, that he was to pay for all of Karen's medical expenses for one year in lieu of providing health insurance, but this provision was not included in the written order of the court of the same date. Then, in the final contempt order of October 2008, the chancellor ordered him to pay for a plan, which Karen applied for, that had a monthly premium of $379.95 or $4,559.40 a year. This amount was included in the October 2008 order's total judgment of $16,559.40.
¶ 58. David now argues that the "period of liability" for Karen's health expenses ended in December 2008, because he provided proof Karen was covered through his employer's insurance through December 2007, an additional three months that he was not aware of at the divorce proceedings, and subsequently Karen made no attempt to apply for Tenn-Care coverage. Therefore, he argues it was improper for the chancellor to now require him to pay Karen's health-insurance premium for twelve more months.
¶ 59. We find the chancellor did not err in her ruling. David was ordered to provide health insurance for Karen for twelve months, and he did not comply with the order; instead he attempted to shift the blame to Karen's inaction in failing to obtain coverage through Tenn-Care. David cannot successfully argue he is no longer responsible for providing insurance when he never complied with the chancellor's order. David's argument is without merit.

C. Personal Property
¶ 60. David argues that the chancellor erred in awarding Karen $3,000 for clothing and personal property David did not return to her when there was no evidence presented except for Karen's testimony that the property existed. In the original divorce decree, the chancellor listed several items of Karen's personal property that she had found were non-marital property and that were to be delivered to her within ten days of the order's entry, such as numerous designer clothing items, Christmas ornaments, an antique shotgun and rifle, her grandchild's furniture, and metal file cabinets. David had returned a sofa on the list, but the cushions were cut.
¶ 61. On March 4, 2008, the chancellor entered a writ of assistance to allow Karen to search the former marital home to obtain the personal property not returned to her, which she had listed in her motion for contempt. David admitted that he had "tossed" the firearms before the divorce hearing. The value of Karen's clothes alone was estimated at $15,000. At the March 7, 2008, hearing, Karen testified that the only property of hers found at the marital home were some boxes of financial records, which she took. The remaining items the chancellor found that existed and were not returned were based on the non-controverted testimony of Karen. The chancellor took the amount of reimbursement for the property under advisement, and she concluded the value of these items was $3,000. We find no error in this regard.

*1114 D. Attorney's Fees

¶ 62. David's final argument is that if this Court were to find he is not in contempt of court, it was improper for the chancellor to award Karen attorney's fees of $3,000 for the contempt proceeding. However, since we affirm the chancellor's ruling of contempt of court, this issue is without merit.

E. Damages for Frivolous Appeal
¶ 63. In her brief, Karen argues that if this Court affirms the chancellor's finding of contempt, this Court should apply Mississippi Rule of Appellate Procedure 38, which allows the Court to "award just damages and single or double costs to the appellee" if we determine the appeal is frivolous. The question this Court must ask is "whether a reasonable person would have any hope for success." Harris v. Harris, 988 So.2d 376, 380 (¶ 16) (Miss. 2008). With this question in mind, we find that the contempt appeal is not frivolous, and damages against David are, thus, not appropriate.

CONCLUSION
¶ 64. The record supports the chancellor's categorization and division of the parties' assets. The chancellor carefully weighed the Ferguson factors in coming to her conclusions after listening to testimony about the parties' marital situation and property. Additionally, the chancellor properly found David in contempt of court and awarded further judgments for his failure to comply. However, we decline to assess David damages as Karen suggests, because his appeal of the judgment of contempt of court is not frivolous. In conclusion, we affirm the chancellor's judgments on both the property distribution and contempt of court matters.
¶ 65. THE JUDGMENTS OF THE CHANCERY COURT OF DESOTO COUNTY ARE AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., MYERS, P.J., GRIFFIS, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. CARLTON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. LEE, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY IRVING, J.
LEE, P.J., concurring in part and dissenting in part:
¶ 66. While I agree with the majority that David Doyle is guilty of contempt, I dissent as I find the valuation of the marital assets was without support. I concede that the chancellor was presented with unreliable information listed on the 8.05 financial statements; thus, she lacked information from which to make a decision. However, the error regarding the value of the couple's 2002 Infiniti automobile appears to be a clerical error which the chancellor could have easily corrected.
¶ 67. Karen Doyle was awarded $2,500, or half of the equity in the Infiniti, which was based on the erroneous entry in the financial statements that the Infiniti had a $5,000 positive value. On his 8.05 financial statement, David stated that the value of the vehicle was $23,000, and the loan amount was $28,000. He failed to indicate a negative symbol next to the difference, which was $5,000; thus, the amount was added rather than subtracted. Instead of noting this error, the chancellor decided that since David had executed the document under oath and stated that the vehicle had a positive value, she would use that erroneous value and award Karen half of that amount. I cannot agree with this. Although David mistakenly indicated a positive value of $5,000, he indicated in the *1115 same document that the value of the vehicle was less than the loan balance. The chancellor's decision had the effect of giving the vehicle a value of $33,000. A value of $33,000 minus the loan balance of $28,000 would provide equity in the amount of $5,000. This is the only way to reach this conclusion.
¶ 68. The majority concludes that because Karen agreed she was owed $2,500, then the positive value of $5,000 must be correct. This is the equivalent of saying two wrongs make a right. I find that the chancellor's decision, which basically added $10,000 to the value placed on the vehicle on the 8.05 financial statement, was arbitrary. The majority finds that this is not reversible error because it is possible the clerical error was in the value placed on the vehicle, rather than the failure to indicate the difference between $23,000 and $28,000 is a negative number. Instead of relying on a possibly erroneous calculation, I would remand this case for evidence of an appraisal of the vehicle from an easily obtained source, such as the National Automobile Dealer's Association (NADA) or Kelley Blue Book.
¶ 69. Therefore, I would reverse the chancellor's judgment on the issue of property distribution and remand this case for a determination of the correct value of the vehicle. I would affirm as to issue two.
IRVING, J., JOINS THIS OPINION.
NOTES
[1] A mathematical error in the judgment gave David a balance of $24,111.40 to pay instead of $23,611.40. David, however, has not asserted this mistake as an error on appeal.
[2] David requested the Mississippi Supreme Court dismiss his first appeal of the September 2007 decree after his appeal of the contempt order was filed. The supreme court granted the dismissal; however, in December 2008, David moved, and the supreme court granted, his pro se motion to reinstate the initial appeal.