# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-00503-COA

**ERICK GARRISON**                                                    **APPELLANT**

**v.**

**CARRIE COURTNEY**                                                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 11/30/2018 |
| TRIAL JUDGE: | HON. JAMES B. PERSONS |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | NATALIA VIAN PORSCHE |
| ATTORNEY FOR APPELLEE: | ALBEN NORRIS HOPKINS JR. |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 09/29/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE CARLTON, P.J., WESTBROOKS AND LAWRENCE, JJ.

### CARLTON, P.J., FOR THE COURT:

¶1.     Erick Garrison appeals from the judgment of divorce granted in favor of Carrie Courtney. He asserts that the chancery court erred by granting Carrie a divorce on the ground of habitual drunkenness and by awarding custody of the parties' minor children to Carrie. Erick also asserts that the chancery court erred when it held him in contempt for non-payment of child support under the chancery court's temporary order issued after the first day of trial and for awarding Carrie attorney's fees relating to that motion. Erick asserts that the motion for contempt was not properly noticed or heard, and he further asserts that it was improperly granted on the merits. Finally, Erick appeals the chancery court's decision to partially deny his post-trial motion to alter or amend the judgment. Finding no error, we affirm.

**I.**     **Pre-trial History**

¶2.     On October 14, 2016, Carrie filed her complaint for divorce against Erick on the ground of habitual drunkenness, among other grounds. Carrie sought "paramount" physical custody and control of the parties' minor children, Edward,[1] a boy born in March 2002; Leo, a boy born in May 2009; and Hunter, a boy born in October 2010. She also sought, among other things, child support, a restraining order of at least 500 feet against Erick, and an award of attorney's fees and costs.

¶3.     Erick filed his answer and counter-complaint. In his counter-complaint, Erick sought a divorce from Carrie on the ground of adultery, among other grounds, and requested "primary" physical custody and control of the parties' minor children and child support. In his answer, Erick denied that Carrie was entitled to a divorce on any of the grounds listed in her complaint but admitted that she was entitled to a divorce based on irreconcilable differences. Erick asserted condonation, among other affirmative defenses.

¶4.     The record reflects that Carrie had a daughter from a previous relationship, Elizabeth,[2] who was born in October 2000. At all relevant times, Elizabeth lived with one or both of the parties. Erick asserted a claim of in loco parentis status over Elizabeth in his counter-complaint. However, the chancery court specifically found in its judgment of divorce that

---

[1] Pseudonyms are used for the parties' minor children.

[2] A pseudonym is used. "Elizabeth" was a minor when she testified at trial.

2

Erick did not pursue the in loco parentis claim at trial. Erick did not challenge this determination on appeal and specifically acknowledged in his appellant's brief that he "did not proceed with his claim for custody of [Elizabeth]" at trial.

¶5. Carrie filed her answer to Erick's counter-complaint, generally denying his allegations and grounds for divorce.

¶6. On April 21, 2017, the parties' divorce matter was set to be heard beginning September 5, 2017. On September 6, 2017, the chancellor heard the testimonies of Erick, whom Carrie called as an adverse witness, and Elizabeth (Carrie's daughter and Erick's stepdaughter who was sixteen years old at the time). After hearing their testimonies, the chancery court entered a temporary order on September 11, granting Carrie temporary legal and physical custody of the minor children subject to Erick's right to visitation. Carrie was also granted temporary exclusive use and possession of the marital home. Erick was ordered to pay child support for the minor boys in the amount of $250 for the month of September and $500 per month beginning October 1, 2017. Both parties were enjoined from consuming alcohol in the presence of their minor children. The chancery court set forth the basis for its temporary ruling as follows:

> The Court, after one day of trial, has concerns for the safety and security for the three minor children currently living with the father. One of the children has been diagnosed with Type 1 Diabetes and is required to have frequent doses of insulin injections up to six (6) times a day. These injections vary depending on a formula and blood levels of the minor child. The Court is required to look out for the best interest of the children at all times. The Court has heard the testimony of the father and sixteen (16) year old step-daughter. The Court has instructed the parties to reschedule the remainder of trial at the

3

earliest available dates as both counsel of record were unable to carry over this trial during a term setting.

Trial was set to continue beginning January 3, 2018.

¶7.    On December 28, 2017, Carrie's counsel filed a motion for contempt, alleging that Erick violated the chancery court's September 11, 2017 temporary order because he failed to pay child support and allegedly harassed Carrie. Carrie also sought attorney's fees in that motion. The certificate of service attached to this motion indicates that Erick was personally served with the motion on December 28, 2017. The record indicates that on December 27 (one day before the motion was filed) a Rule 81 summons[3] was issued for the motion, summoning "[Erick] to appear and defend against said motion for citation and contempt at 9:00 a.m. on the 3rd day of January 2018."

¶8.    After four more days of trial taking place on January 3, 4, 5, and 8, 2018, and after hearing closing arguments on March 6, 2018, the chancery court entered its judgment of divorce (judgment) on November 30, 2018.[4]  Relevant to this appeal, the chancery court granted Carrie a divorce from Erick on the ground of habitual drunkenness, and the court awarded joint legal custody to the parties and physical custody of the parties' minor children

---

[3] M.R.C.P. 81.

[4] The chancery court specified in its judgment that it was entered as a final judgment pursuant to Rule 54(b) of the Mississippi Rules of Civil Procedure, as follows:

> [T]he court, finding that there is no just reason for delay, enters this Judgment as a [Mississippi Rule of Civil Procedure]. 54(b) Final Judgment with respect to all issues except distribution of any remaining debt associated with the marital home and the court reserve[s] ruling upon the same.

to Carrie, with Erick to have "liberal visitation" as delineated in the judgment. The chancery court also awarded Carrie child support and ordered Erick to "provide major medical health coverage, vision, prescription, and dental insurance [for the children] . . . [with each party] responsible for one-half . . . of the cost of deductibles and co-payments, out-of-pocket expenses[,] and medication expenses related to the children." Additionally, the chancery court found that Erick was in contempt for non-payment of child support under the September 11, 2017 temporary order for part of September 2017 and for the months of October through December 2017. The chancery court ordered that the amount in arrears was to be charged against Erick's equitable distribution of the marital assets. The chancery court further ordered Erick to pay Carrie's attorney's fees in the amount of $4,000 relating to her motion for contempt.

¶9.     Erick filed a motion to amend or alter the judgment pursuant to Mississippi Rule of Civil Procedure 59(e), asserting that the chancery court lacked jurisdiction to hear Carrie's motion for contempt due to a faulty Rule 81 summons and improper notice and that he was denied a fair opportunity to present his defenses because the motion was not properly heard. Erik also sought to set aside the award of attorney's fees relating to that motion. Additionally, Erick sought to reopen the chancery court's judgment on the child support issue to allow him to present "evidence concerning the loss of [his] employer-provided major medical insurance . . . [that] was unavailable at the time of trial."

¶10.   On February 19, 2019, the chancery court entered an order correcting what the court

recognized was a clerical error concerning the attorney's fees awarded relating to Carrie's motion for contempt. The chancery court reduced Carrie's award of attorney's fees to $1,000. The chancery court denied the remaining issues in Erick's motion. Erick appealed, asserting that the chancery court erred by (1) granting Carrie a divorce on the ground of habitual drunkenness; (2) awarding custody of the parties' minor children to Carrie; (3) holding Erick in contempt for non-payment of child support and awarding Carrie attorney's fees relating to her motion for contempt when the motion was not properly noticed or heard; (4) granting Carrie's motion for contempt and request for attorney's fees on the merits; and (5) partially denying Erick's Rule 59(e) motion.

¶11.     We now provide an overview of the evidence and testimony presented at trial relating to the issues on appeal, with further details to be discussed as these issues are addressed below.

## II.     The Trial

¶12.     In support of her case, Carrie called Erick as an adverse witness and Elizabeth (Carrie's daughter from a prior relationship), who both testified on September 6, 2017. Carrie testified on January 4, 2018.  In support of his case, Erick called the parties' eldest son, Edward, who was fifteen at the time of trial; Erick's father, John Garrison; Johnny Holliman, who performed drywall work for Erick and Courtney over two or three weeks in 2016; and Katie Randall, the 2016-2017 soccer coach for the parties' youngest son, Hunter. Erick also testified.

6

¶13.    At the time of trial, Carrie was thirty-nine and Erick was forty-six. They were first in a relationship from 2002 to 2004. They eventually reunited in 2007 and were married on April 7, 2010.  As noted above, the parties had three sons together, Edward, Leo, and Hunter, who were fifteen, eight, and seven, respectively, at the time of trial.  Carrie also has a daughter by a prior relationship, Elizabeth (Erick's stepdaughter), who lived with the family. Elizabeth was sixteen when she testified on the first day of trial in September 2017.  The record reflects that Leo suffers from bulimic tendencies and counseling was recommended. The record also reflects that Hunter was diagnosed with Type I diabetes in March 2017.  He requires six to eight insulin shots per day.

¶14.    Carrie testified about Erick's drinking habit and his behavior when he had been drinking. She testified that the parties attended couple's counseling in 2008-2009 (before they were married) and that Erick's drinking was one of the subjects they discussed in counseling.  Carrie testified that after counseling, Erick stopped drinking for a time, but then he began drinking again with more and more frequency, continuing to the present. She testified that Erick's routine was to come home from work and begin drinking beer on the front porch.  Neighbors also stopped by a few times each week to talk and drink with him.

¶15.    Carrie testified that in 2013, she believed, she went to stay with her grandmother for about a week because Erick was "drinking every day," and there was "fighting all the time in front of the kids, [he was] . . . constant[ly] belittling me in front of the children and

7

drinking, and I just had enough and wanted to get out of there."[5] Carrie further testified that Erick's drinking "started out with just like one or two drinks in the afternoon, and then it just got more and more and more throughout the years, like three to four, five or six. So it was just more. And then, like even after one drink, he would get loud." She said that this began in about 2014 or 2015. Carrie testified Erick's drinking became "out of control" in 2016, and he also became violent, punching furniture in front of children and becoming argumentative with them. By this time, according to Carrie, Erick was drinking up to a six-pack about five days a week.

¶16.    Carrie testified that she left the marital home in October 2016 for approximately three months because of Erick's behavior when he was drinking, she was "just scared that if he was becoming violent punching furniture, that [she] would be next." Carrie further testified that her previous lawyer advised her to return to the marital home until the parties' went to court and reached an agreement, so she went back to the marital home in December 2016, but she stayed for just two weeks. She testified that while she was at the marital home, it was "a nightmare" for her. She was sleeping in the younger boys' bedroom to try and stay away from Erick, and, according to Carrie, every night Erick "would come to the bedroom, yell and scream at me at 10:00, 11:00, and keep the kids awake. I would beg him to leave me alone, just leave me alone, [and] let us go to sleep." Carrie testified that in mid-December 2016 she

---

[5] Erick testified that he believed that Carrie "stayed at her grandma's house for a week or something" in 2015 (not 2013), "and then [she] came home."

moved out again because this was happening "every single night." The children remained with Erick in the marital home. Carrie did not live in the marital home after this point until the chancery court issued its temporary order in September 2017 granting Carrie temporary legal and physical custody of the minor children and temporary exclusive use of the marital home.

¶17. Carrie was asked why she did not bring the children with her when she left in mid-December 2016. She testified:

> Because [Erick] physically would not let me take four kids and pack up four kids and get them out of the house. And so, for me, I thought the only option I had was to leave and get established, and then hire an attorney and help me get my kids, because I didn't know what else to do.

Carrie also testified that during the time she had moved out of the marital home, she did what she could to make sure the children were safe, as follows:

> I would go there every morning. I usually packed their lunch at my house. I would go there every morning, make sure they were dressed, bring them to school. Half the time, I would bring [Edward] to school. Other times he would ride with Erick. And if I noticed they didn't have food, I would bring them food. If they needed clothes, I would buy them clothes.

¶18. Additionally, Carrie testified that in March 2017, when Hunter was diagnosed with diabetes, she stayed in the marital home with the other children while Erick stayed with Hunter in the hospital. Photographs of the marital home Carrie took when she was there in March 2017 were admitted into evidence. The photographs show little food in the refrigerator, and some of what was kept there was covered in mold. There are piles of dirty laundry, dirty bathrooms, and dirty bedrooms throughout the home as well as empty beer cans

9

on the porch. Carrie testified that she stayed up the entire night cleaning the home when she saw the condition it was in. Also at this time (in March 2017) she found a bag of marijuana in the nightstand next to Erick's bed, along with a pipe she testified was Erick's pipe that was used to smoke marijuana. Photos of the marijuana and pipe were admitted into evidence.[6]

¶19.   Between January and March 2017, Erick called or texted Carrie numerous times each day leaving messages using mean and vulgar language. Some of the voicemail messages were played for the chancery court when Erick was called as an adverse witness in March 2017. Erick admitted to making the calls or sending text messages to Carrie, on average, over twenty times per day during this time, though he testified that the average of forty-nine calls per day in February 2017 (as indicated in the call records admitted into evidence) probably had some accidental calls to Carrie, or some could have been the children calling her. Erick admitted that at times he was intoxicated when he called Carrie and while the children were in his care. Carrie also testified that Erick would call her when he was intoxicated, his voice would be slurred, and the children would tell her "he was drinking." Carrie further testified that after the trial began in September 2017 and the chancery court entered its temporary order, these type of phone calls decreased, but as of January 2018 when the trial was continued, she continued to receive them.

¶20.   The record also reflects that in 2017 Carrie called the police on four occasions. Carrie

---

[6] When asked about the bag of marijuana and pipe found in his nightstand in March 2017, Erick testified that he did know the marijuana was there and that the pipe belonged to Carrie. He testified that they had shared it over the years.

testified that she did so because arguments with Erick had become heated, and she was trying to find a way to calm Erick down. She also testified that she called his father and neighbors for help due to Erick's drinking and yelling and screaming because she did not know what else to do. The incident report for one of these incidents reflects that Erick shoved Carrie and threw her phone in the yard.

¶21. Carrie testified that she does not smoke marijuana and last did so in her twenties. Carrie admitted that she gave Erick a bag of marijuana for his birthday in "maybe 2015." She also admitted that in May 2014, when she was working for a particular doctor, she phoned in a prescription for hydrocodone (a painkiller) for Erick when he did not have such a prescription. She admitted that she knew to do so was illegal. She testified that she phoned in that prescription "[b]ecause Erick asked me to" and that Erick "sold them, [the hydrocodone pills]." She testified that she knew this because "[she] was there when he was on the phone making the deal."

¶22. Elizabeth testified that she remembered a lot of arguing between the Carrie and Erick and his regular drinking around October 2016. According to Elizabeth, Erick drank beer on the porch every day. Her parents also seemed to fight often in front of the children. She testified that her mother slept in her younger brothers' bedroom to try and stay away from Erick. She said that Erick was often at home and already drinking when she arrived after school and was embarrassed that her friends on the school bus would see Erick's empty beer cans lined up on the front porch.

11

¶23.   Elizabeth described a particular incident in 2017 when Erick got "really drunk" and was "falling all over the place" at a regatta in Pensacola. She was "really scared" that night because, according to Elizabeth, he drove while he was intoxicated when he took her and Edward to the place where they were staying that evening. She also testified that Erick had driven in that condition before.

¶24.   As noted above, Hunter, the parties' youngest son, was diagnosed as diabetic in March 2017, and he needed between six to eight insulin injections a day. Elizabeth testified that she knows how to give these injections, and she further testified that she did not believe that her father does "the correct calculations for [Hunter's] insulin. And since he's drinking, I'm scared he'll, like, give too much insulin. And there's, like, no room for mistakes, really." She testified about a night when "[d]ad [Erick] was drinking a lot, [a]nd [Hunter] had to remind him to give him his shot. But Dad just kept saying, you don't need it, you'll be fine, . . . [a]nd Hunter had to beg him. And then [Erick] told Edward, and Dad made [Edward] give . . . the shot [to Hunter]."[7] Elizabeth also testified that she was upset that even though her other younger brother Leo was "making himself sick [by throwing up]" all summer, her father never noticed it.

¶25.   Elizabeth testified that she left with Carrie for one week when Carrie moved from the marital home in December 2016 but that she returned to the marital home to help care for her younger brothers. She testified that during this time she did all of the cooking and cleaning

---

[7] Edward testified that he does not know how to give Hunter his insulin shots.

12

and helped her younger brothers with their homework. Elizabeth further testified that her mother would try to be there every morning and that "she would [also] come by to drop off groceries or to take [the younger boys] to doctors' appointments. Elizabeth testified that she eventually returned to her mother's new home after Erick flipped the kitchen table on her while she was helping Leo with his homework.

¶26.    Edward also testified at trial. Edward said that he wanted to live with his father and that Carrie was not involved in his sailing practices or regattas, and did not contribute to his school tuition. Edward described an incident when he called his father because his mom was threatening to smash his X-box, and his dad called the police because of the argument between him (Edward) and his mother. According to the incident report relating to this matter, the incident happened in December 2017.

¶27.    Regarding the Pensacola regatta incident, Edward testified that his father "had a buzz going on" that day, and he knew this because "he was like partying. He was like dancing around and stuff." Edward then said that his "coach took [his father's] keys so that he couldn't leave until he was sober." He testified that he did not believe his dad was intoxicated when he later drove him and Elizabeth to the place they were staying because his "coach gave [his father] his keys [when] she thought he was safe to drive. And then we drove [to the place we were staying]." Edward testified that his father had administered Hunter's insulin injections after drinking beer. Edward admitted it was not uncommon for his father to yell at him and his brothers, and this would generally take place after his father has had

13

two to five beers. Edward also confirmed that his father allowed him to drive home from the yacht club when he did not have a permit or license. He believed it happened about ten times.

¶28. As noted above, Erick sought a divorce from Carrie based upon the ground of adultery, among other grounds, alleging that Carrie was in a relationship with a man named Cliff Baker. Erick testified that he discovered Carrie was in a relationship with Baker in November 2016 when Elizabeth showed him screenshots that she had retrieved from Carrie's phone from the previous weekend indicating a relationship. He testified that the text messages said things like "come back, good morning, I love you," but no such text messages were entered into evidence. Erick's father, John Garrison, testified that he saw Carrie's vehicle, which he identified by its "LBYC" (Long Beach Yacht Club) sticker, parked outside Baker's home a few times in October 2016. He admitted, however, he never saw Carrie herself at Baker's home.

¶29. The record also reflects that in mid-September 2017, Edward was arrested and held at the youth detention center overnight after fighting with Carrie. Edward testified that he had seen his grandfather's truck (which Carrie had recently inherited) at Baker's home and "confronted" his mom about it and that she threatened to take away his X-box. Edward subsequently admitted that he did not know who had driven the truck to Baker's home or whether it was being kept there for storage or repair. He just saw it in the driveway.

¶30. Carrie admitted that she knew Baker prior to the marriage, however she testified that

she has called him only a handful of times over the last thirteen years, that he was not around her boys, and that she has not discussed Baker with her boys. Carrie admitted to having a sexual relationship with Baker in January 2017, after the parties' final separation in December 2016. She also confirmed that her relationship with Baker did not have anything to do with her moving out of the marital home in 2013, October 2016, or December 2016.

¶31. Erick testified that while the minor children lived with him from October 2016 to September 2017, he was acting as a "single parent taking care of four kids, dealing with homework, school, cooking dinners," as well as taking Leo and Hunter to soccer practices and games, assisting Hunter's soccer coach with coaching, taking Edward to sailing practices, and paying for Edward's tuition.

¶32. Erick testified that he would drink anywhere from two to four beers about "five days, six days out of the week." He admitted that in July 2017 he drove his son home from a regatta after Erick and other parents "smoked weed and drank beer" and that he has allowed his son Edward to drive him after he has been drinking. Erick admitted that Edward did not have his permit or driver's license at the time.

¶33. John Garrison (Erick's father) testified that based on seeing Erick at his (John's) home, Erick's drinking had recently (as of the time of trial) "tapered back down. He doesn't drink like he was there for a while." Erick also called John Holliman as a witness, a man who did drywall work at the marital home in 2016 over a two to three week period. Holliman testified that during that time, he worked from about 8 a.m. to 5 p.m. but did not

15

work at the Garrison house every day during the two or three week period. He testified that when he was working at the Garrison house, he saw Erick drink one beer. Erick's other witness, Katie Randall, Hunter's October 2016 to April 2017 soccer coach, testified that she never saw Erick under the influence of alcohol at the soccer practices or games.

¶34.    Erick admitted that he occasionally smoked marijuana. Regarding Carrie's testimony about the hydrocodone, he testified that he objected to her phoning in the prescription without the doctor's permission and that he did not sell the hydrocodone pills.

¶35.    After both parties rested their cases on January 8, 2018, the chancery court directed that the parties be prepared to give closing statements going over each of the issues in this case, as well as the *Albright*[8] factors relating to the child custody issue. The chancellor heard the parties' closing arguments on March 6, 2018, and on November 30, 2018, the chancery court entered its judgment of divorce, as detailed above. Also as detailed above, the chancery court denied Erick's subsequently filed Rule 59(e) motion, except that it corrected what it recognized was a clerical error concerning the attorney's fees awarded to Carrie on her motion for contempt. Carrie's attorney's fees award was reduced to $1,000. Erick appealed.

## STANDARD OF REVIEW

¶36.    "The scope of review in domestic cases is limited by the substantial evidence/manifest error rule. This Court will not disturb a chancellor's findings unless they were manifestly

---

[8] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

wrong or clearly erroneous, or the chancellor applied an erroneous legal standard." *Lee v. Lee*, 154 So. 3d 904, 906 (¶5) (Miss. Ct. App. 2014) (citations omitted). "Chancellors are afforded wide latitude in fashioning equitable remedies in domestic-relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record." *Dickinson v. Dickinson*, 293 So. 3d 322, 326 (¶5) (Miss. Ct. App. 2020). Indeed, the Mississippi Supreme Court has recognized that 'when reviewing a chancellor's decision, we will accept a chancellor's findings of fact as long as the evidence in the record reasonably supports those findings." *Mercier v. Mercier*, 717 So. 2d 304, 306 (¶8) (Miss. 1998) (internal quotation marks omitted).

¶37. "The sufficiency of the evidence is determined by the chancellor, who sits as finder of fact and makes determinations as to the weight and credibility of the evidence," and "the facts of a divorce decree [are viewed] in a light most favorable to the appellee." *Peters v. Peters*, 906 So. 2d 64, 68 (¶12) (Miss. Ct. App. 2004) (citations omitted). "Thus, our standard of review of a divorce decree is very deferential, and we will not reverse in the absence of manifest error." *Id.*

## DISCUSSION

### I.      Habitual Drunkenness

¶38. Erick asserts that Carrie did not meet her burden of proving his habitual drunkenness, and therefore the chancery court erred in granting Carrie a divorce on this basis. Erick further asserts that the defenses of "condonation or antenuptial knowledge" bar Carrie's

17

habitual-drunkenness claim. We find no merit in these assertions for the reasons discussed below.

## A.    Carrie's Habitual-Drunkenness Claim

¶39.    "A court may grant a divorce on the ground of habitual drunkenness if the plaintiff proves that: (1) the defendant frequently abused alcohol; (2) the alcohol abuse negatively affected the marriage; and (3) the alcohol abuse continued at the time of the trial." *Lee*, 154 So. 3d at 906 (¶7) (internal quotation mark omitted).  A divorce granted on the ground of habitual drunkenness must be supported by clear and convincing evidence.  Matthew Thompson, *Mississippi Divorce Alimony and Child Custody* § 4:160, Westlaw (database updated Sept. 2019).

¶40.    The chancery court in this case found as follows:

> It is clear from the record that Erick has a longstanding history with alcohol consumption and that his behavior was a source of conflict throughout the marriage. Erick's drinking affected his behavior which led to constant fighting and sometimes physical or violent outbursts. As a result, Carrie began avoiding Erick and eventually left the marriage. The parties' fighting often occurred in front of the minor children and Erick's drinking, on many occasions, affected his ability to adequately care for his children.
>
> The court finds that Erick's conduct was the cause of separation and dissolution of the marriage and therefore finds that Carrie is entitled to a divorce from Erick on the statutory ground of habitual drunkenness[.]

¶41.    Erick asserts that Carrie did not prove any of the elements of a habitual-drunkenness claim.  As to the first factor, he assert that she failed to meet her burden to prove that he "frequently abused alcohol" because the evidence shows that he was "only an occasional

drinker" and that he is employed as a full-time as an inspector/engineer, without having any problems at work. He also relies on the testimonies of John Holliman, who did drywall work at the marital home in 2016 over a two to three week period, and Katie Randall, Hunter's October 2016 to April 2017 soccer coach. Holliman testified that he only saw Erick drink one beer when he (Holliman) was working at the house; Katie testified that she never saw Erick under the influence of alcohol at Hunter's soccer practices or games.

¶42. We observe that the chancellor heard all of the testimony Erick describes—but the chancellor also heard testimony from Carrie, Elizabeth, Edward, and even admissions from Erick himself that fully support a determination that Erick "frequently abused alcohol," *Lee*, 154 So. 3d at 906 (¶7), and the chancery court's finding that "[i]t is clear from the record that Erick has a longstanding history with alcohol consumption and that his behavior was a source of conflict throughout the marriage."

¶43. For example, Carrie described how Erick's drinking became progressively worse over the years, both in quantity and in the number of days Erick drank,[9] and she described numerous occasions when Erick's drinking affected his behavior, which led to constant fighting and sometimes physical or violent outbursts. Erick's stepdaughter, Elizabeth,

---

[9] Erick asserts that Carrie testified "that Erick drank a case of beer every day, seven days a week." This statement is simply not true—neither our review of the record, nor the record citations in Erick's appellant's brief that he relies upon, support this statement. Rather, the record reflects that Carrie did not say this in her testimony, and the chancery court did not make any such a finding. Carrie testified that Erick's drinking progressed to the point that in 2016 Erick was drinking up to a six-pack about five days a week, and the chancery court likewise made a finding of fact on this point in its judgment.

19

likewise testified that she remembered a lot of arguing between her parents and Erick's regular drinking around October 2016. She specifically described a regatta in Pensacola in 2017 when Erick got "really drunk" and was "falling all over the place." Edward, Erick's oldest son, likewise testified about this incident and said that his coach had to take his father's "keys so that he couldn't leave until he was sober." Erick admitted that in July 2017 he drove his son home from a regatta after Erick and other parents "smoked weed and drank beer" and that he has allowed his son, Edward, who did not have a driver's permit or license, to drive him after Erick had been drinking. We find no merit in Erick's assertions on the first element of a habitual drunkenness claim.

¶44. Erick also asserts that Carrie failed to sufficiently prove that "the alcohol abuse negatively affected the marriage." *Lee*, 154 So. 3d at 906 (¶7). Erick asserts that "it is more likely that Carrie left Erick . . . to resume her relationship with [Baker], not because of Erick's alcohol abuse."

¶45. The chancery court, however, did not make this determination, but instead found that "Erick's drinking affected his behavior [that] led to constant fighting and sometimes physical or violent outbursts. As a result, Carrie began avoiding Erick and eventually left the marriage." We find that there is substantial evidence supporting this determination, including the evidence discussed above, as well as Carrie's explicit testimony describing Erick's drinking-related outbursts and how this led to her leaving him him for a week in 2013 or 2015 to stay with her grandmother; for three months from October 2016 to early December

20

2016; and then permanently in mid-December 2016. Accordingly, we find no merit in Erick's assertions relating to the second element of a habitual-drunkenness claim.

¶46. Erick further asserts that Carrie did not prove that his drinking "continued at the time of the trial," the third element of a habitual drunkenness claim. *Lee*, 154 So. 3d at 906 (¶7). We find, however, that there is substantial evidence that he was continuing to abuse alcohol at the time of trial. The record reflects, and the chancery court made the factual determination, that between January and March, 2017, Erick called or texted Carrie between twenty and forty-nine times each day leaving messages using mean and vulgar language. Erick generally admitted to doing so, although he testified that the average of forty-nine calls per day in February 2017 probably had some accidental calls to Carrie, or were the children calling her. Erick admitted that at times he was intoxicated when he called Carrie. Carrie also testified that she could tell Erick was intoxicated because his voice would be slurred. Although Carrie testified that these calls decreased after the chancery court entered its temporary order in September 2017, Carrie also clearly testified that as of the time of trial she continued to receive them and that Erick sounded drunk when he left them.

¶47. Erick also asserts in his appellant's brief that his father, John Garrison, testified at trial that "Erick was not drinking at the time of trial." John Garrison actually stated at trial that Erick's drinking had "tapered back down." Further, John testified that he sees Erick in "the afternoons" and "weekends," and he frankly admitted that he really did not know what Erick did after he left his (John's) home. We find no merit in Erick's assertions relating to the third

21

continuity element of a habitual-drunkenness claim.

¶48. In sum, based upon our review of the record, we find that the chancery court had sufficient evidence to grant Carrie a divorce on the ground of habitual drunkenness. As this Court recognized in *Lee*, 154 So. 3d at 907 (¶12), "[w]here there is conflicting testimony, the chancellor is the trier of fact and adjudicates the credibility of each witness." Under our "very deferential" standard of review, "we will not reverse in the absence of manifest error." *Peters*, 906 So. 2d at 68 (¶12). "Because the evidence supports the chancellor's findings, we find that he did not commit manifest error in his findings on this issue." *Lee*, 154 So. 3d at 907 (¶12).

### B. Erick's Condonation Defense

¶49. Erick asserts that because "Carrie knew about Erick's moderate beer drinking in 2008-2009, before she married him in April 2010,"[10] her "condonation or antenuptial knowledge" bars her from obtaining a divorce on the ground of habitual drunkenness. We find no merit in this assertion. Under Mississippi law, "[c]ondonation is the forgiveness of a marital wrong on the part of the wronged party." *Wood v. Wood*, 495 So. 2d 503, 505 (Miss. 1986). In this regard, "[c]ondonation, even if a true condonation exists, is conditioned on the offending spouse's continued good behavior. If the offending party does not mend

---

[10] Erick asserted a defense of condonation in his answer to Carrie's complaint for divorce but did not assert a defense of antenuptial knowledge. We therefore address only his condonation defense. "Condonation or antenuptial knowledge, as affirmative defenses, must be specifically pleaded or else the defenses are waived." *Lee*, 154 So. 3d at 907 (¶15).

his or her ways and resumes the prior course of conduct, there is a revival of the grounds for divorce." *Id.* Further, "[t]he knowledge attributed to the complainant by way of this defense must have been of a *significant nature* and must proximately relate to *the severity of the cause* giving rise to the divorce." Thompson, *supra*, § 5:13 (emphasis added).

¶50. In this case, Erick supports his condonation defense by quoting Carrie's testimony at trial that one of the issues she and Erick talked about in couple's counseling before they were married was his alcohol usage. Carrie also testified, however, that Erick stopped drinking for a time after counseling but started up again. As we have addressed above, she testified that his drinking progressively became worse over the years and that by 2016 his drinking "became out of control," and he became violent. In short, any knowledge that Carrie had of Erick's drinking in 2008-2009 does not relate to the "severity of [his habitual drunkenness] giving rise to the divorce." *Id.* Even if Carrie had condoned Erick's drinking at any point, her basis for a habitual-drunkenness ground for divorce revived due to his progressive drinking and violence leading up to their separation. *Wood*, 495 So. 2d at 505. Accordingly, we find no merit in Erick's assertion that his condonation defense barred Carrie's habitual-drunkenness claim.

## II. Custody of the Minor Children Edward, Leo, and Hunter to Carrie

¶51. Erick asserts that the chancery court erred in awarding custody of Edward, Leo, and

Hunter to Carrie.[11]  "The polestar consideration in custody matters is the best interest and welfare of the child," and the factors set forth in *Albright*, are to be used in making this determination.  *Mercier*, 717 So. 2d at 306 (¶10).

¶52.    The *Albright* factors are as follows:

1.      Age, health, sex of the child.

2.      Continuity of care prior to the separation.

3.      Parenting skills and willingness and capacity to provide primary child care.

4.      Employment of the parent and responsibilities of that employment.

5.      Physical and mental health and age of the parents.

6.      Emotional ties of the parent and the child.

7.      Moral fitness of the parents.

8.      The home, school, and community record of the child.

9.      The preference of the child at the age sufficient, by law, to express a preference.

10.     Stability of home and employment of each parent.

11.     Other factors relevant to the parent-child relationship.

*Id.* (citing *Albright*, 437 So. 2d at 1005).  In this case, the chancery court found that factors

---

[11] As noted above, in his counter-complaint, Erick asserted an in loco parentis claim with respect to Elizabeth but did not pursue it at trial.  The chancery court, therefore, specified in its judgment that its *Albright* analysis and custody determination pertained only to the three minor sons.

24

one, three, five, eight, and ten weighed in Carrie's favor. The chancery court found that the remaining factors favored neither party.[12] After thoroughly addressing each *Albright* factor in its judgment, the chancery court awarded the legal and physical custody of the parties' minor children to Carrie and granted Erick regular visitation as delineated in the judgment.

¶53. Erick asserts that the chancery court erred in its analysis with respect to all of the *Albright* factors, except for factor four (employment of the parent and responsibility of that employment), which the chancery court found favored neither party. We now address the *Albright* factors below.

*Factor 1: Age, Health, Sex of the Child*

¶54. In assessing this factor, the chancery court recognized that all three minor children were boys, and that at the time of trial Edward was fifteen years old, Leo was seven years old, and Hunter was six years old. The chancery court then described the two younger boys' health problems. Namely, Leo suffers from bulimic tendencies, and his physician recommended seeing a counselor, and Hunter was diagnosed with Type I diabetes in March 2017. Hunter's condition requires constant monitoring and as many as eight insulin injections each day. The chancery court concluded that this factor favors Carrie, a nurse, because of the children's health issues.

¶55. Erick asserts that the chancery court erred in making this determination because it

---

[12] The chancery court addressed *Albright* factors one through ten in its judgment. As to the catch-all final factor, the chancery court found that there were no other factors that were relevant to the custody issue.

25

failed to take into consideration that (1) all three children are boys; (2) Carrie had committed "illegal acts" while holding her nursing license (calling in hydrocodone without a prescription and giving Erick marijuana on his birthday in 2015); and (3) Carrie had left Hunter in his care from April 2017 until September 2017, "clearly demonstrating" that Erick could care for him.

¶56. This evidence was heard by the chancellor, as well as Carrie's counter-testimony relating to this evidence, and was set forth in the chancery court's findings of fact. Further, in the chancery court's analysis of this factor, the court plainly recognized that the children were boys. The totality of the evidence was considered by the chancery court, and we find no manifest error in its conclusion that this factor weighed in favor of Carrie, a nurse, particularly in the light of Leo's and Hunter's health issues.

*Factor 2: Continuity of Care Prior to the Separation*

¶57. The chancery court found that this factor did not favor either party, recognizing that both parties have cared for the minor children throughout the marriage. The chancery court also recognized that Edward had remained with Carrie during the parties' first separation (prior to their marriage in 2010) and that the children remained with Erick from the date of separation in 2016 until entry of the temporary order in September 2017. The chancery court also recognized Carrie's testimony on this point that "she felt it was best to get away from the marriage, and then seek legal counsel in order to obtain custody of the children."

¶58. Erick asserts that the chancery court erred in not finding that this factor favored him

26

because (1) when the parties' reconciled in 2007, he was also was with Edward; (2) the children were in his care when Carrie left for a week to stay with her grandmother in 2013 and weekends or evenings when Carrie spent time with her close friend, Nikki (a female); and (3) Carrie did not pay any child support or assist with paying the mortgage on the home after she left in October 2016.

¶59. The chancellor heard this evidence and also heard Carrie's testimony that "[Erick] physically would not let me take four kids and pack up four kids and get them out of the house" when she left the marital home in mid-December 2016. She also testified that during this period she continued to care for the children, going to the marital home every morning, packing lunches, and buying them clothes when they needed them. Elizabeth corroborated this testimony.

¶60. Based upon our review of the record, and our deferential standard of review, we find no error in the chancery court's determination that this factor favored neither party.

*Factor 3: Parenting Skills and Willingness and Capacity to*
*Provide Primary Child Care*

¶61. Erick asserts that the chancery court erred in concluding that this factor favored Carrie over him, arguing that the following factors show that "Carrie failed to establish that she had good parenting skills or willingness or capacity to provide childcare": (1) she "abandoned" her children at least three times; (2) she did not participate in the children's extra-curricular activities; (3) she did not provide child support when she left the marital home in mid-December 2016; and (4) she "exposed" the children to Baker. Erick points to his own

27

conduct, in contrast, such as his participation in the children's activities and his role as a "single parent" when Carrie left the children with him, particularly after the final separation when she left in mid-December.

¶62. We find no merit in Erick's assignment of error with respect to this factor. The chancery court analyzed this factor in detail, as follows:

> The record reflects that both parents cared for their minor children during the marriage. Prior to the separation both parties cooked and helped with homework. Erick has taken [Edward] to sailing practices and regattas across the Gulf Coast. He has also taken [Leo] and [Hunter] to soccer practices and games. [Edward] testified that Erick plays basketball with the children and prepared meals during the separation. However, Erick and Carrie have different approaches to medical care for their children. Erick appears to believe that medical treatment is not always necessary even when recommended by a physician and has refused medical treatment for both [Leo] and [Hunter]. Specifically, Erick did not believe [Leo] needed to see a counselor in order to treat his bulimic tendencies, or that [Hunter] needed to be transported to the Mobile Children's Hospital via ambulance when he was diagnosed with diabetes. Both medical services were recommended by the children's physicians. . . . Erick told Carrie that if she took [Leo] to counseling, he would contact his attorney to make sure counseling would not occur. Erick has also admitted that he does not always test [Hunter's] blood sugar levels prior to administering insulin, and instead relies on his intuition as a parent to calculate the correct dosage. While Erick has no medical training, Carrie is a nurse. The record reflects that when the children resided with Erick, the marital home was in a state of disarray, with piles of dirty laundry, molding food in the refrigerator and empty beer cans on the front porch. [Elizabeth] was responsible for most of the household chores. [Edward] also testified that Erick has pulled him by the hair and that Erick has allowed him to drive about ten times without his driver's permit. The court finds that, particularly given the special medical needs of the two youngest children, this factor favors Carrie.

¶63. In addition to the chancery court's thorough analysis of this issue, we also observed that with respect to Erick's assertion that Carrie "exposed" the children to Baker, Carrie

28

admitted that she knew Baker prior to the marriage; however she also testified that she has called him only a handful of times over the last thirteen years and that Baker had not been around her boys in the last thirteen years

¶64.   We find that the chancery court's analysis with respect to this factor, which takes into account the totality of the circumstances and is supported by our review of the record, demonstrates that there is substantial, credible evidence supporting its decision that this factor favors Carrie.

*Factor 4: Employment of the Parent and Responsibilities of that Employment*

¶65.   The chancery court recognized that both parties were gainfully employed and found, therefore, that this factor favored neither party. As noted, Erick does not challenge this determination.

*Factor 5: Physical and Mental Health and Age of the Parents*

¶66.   Erick asserts that the chancery court erred in concluding that this factor favored Carrie, in the light of (1) her depression; (2) the illegal transactions she took part in (calling in the hydrocodone and giving Erick marijuana on his birthday in 2015); and (3) her exposing the children to her "immoral behavior."

¶67.   We find no merit in Erick's assignment of error with respect to this factor. With respect to Erick's "illegal transactions" and "immoral exposure" assertions, the chancery court heard all the evidence relating to these assertions, including Carrie's counter-testimony. With respect to the hydrocodone incident, for example, the record reflects that Carrie

admitted that she knew it was illegal to call the hydrocodone in without a prescription, but she also testified that she did so "[b]ecause Erick asked [her] to," and that Erick "sold them [(the hydrocodone pills)]." Erick denies these assertions, but it is the chancery court's role to weigh and assess the credibility of the witnesses and the weight of the evidence before it.

¶68. Similarly, as to Carrie's "immoral behavior" (as Erick describes), we have already noted above that Carrie had called Baker only a handful of times over the last thirteen years, and Baker had not been around her boys during that time.

¶69. Regarding Carrie's mental health, we observe that in assessing this factor, the chancery court took into account that Carrie has suffered "from depression since she was a teenager and has suffered from anxiety the last five years which she attributes to the stress in the parties' marriage." With respect to these circumstances, the chancery court also found, and the record reflects, that Carrie "takes medication as prescribed for these conditions and it does not interfere with her ability to care for the children." Further, based upon our review of the record, and as discussed above with respect to Carrie's habitual-drunkenness claim against Erick, we find that there is ample evidence supporting the chancery court's analysis with respect to Erick's mental health, as follows: "The court finds from the evidence that Erick is dependent on alcohol to the extent that it has interfered with his relationship with the children and Carrie."

¶70. For these reasons addressed above, the chancery court found that this factor favors Carrie and we find that this determination is supported by substantial, credible evidence.

30

*Factor 6: Emotional Ties of the Parent and the Child*

¶71.   The chancery court found as to this factor that "[t]he record reflects that both parents love their children, however, no specific evidence was presented regarding this factor and the court therefor finds that it favors neither party." Erick asserts that the chancery court erred in this determination because he "consistently spent more time with [the minor children]," while Carrie rarely participated in their extracurricular activities; "abandoned" the boys three times; and "attacked" Edward (referring to Edward's testimony describing the two incidents where Carrie tried to take away Edward's X-box). The record reflects, however, that the reasons Carrie gave for the times she left the marital home and the circumstances surrounding the incidents with Edward do not indicate a lack of love for her children. We find no error in the chancery court's conclusion that this factor favors neither parent. There is ample evidence in the record that both parents loved the children.

*Factor 7: Moral Fitness of the Parents*

¶72.   The chancery court found that this factor favored neither party, taking into account Erick's drinking habit, as discussed above, as well as his admitted use of marijuana as recently as the summer of 2017, while assisting with one of Edward's regattas. The chancery court also found that "Erick for a period of time kept a bag of marijuana on the dresser by his bed . . . and that he shared his bed with the younger boys during the parties' separation." Continuing, the chancery court found that "Erick testified that the marijuana belonged to Carrie, while Carrie testified that she had given it to him as a birthday present several years

31

ago." Regarding Carrie, the chancery court found that Carrie admitted to "the prior use of marijuana and to writing a prescription for pain medication [(the hydrocodone pills)] for Erick."

¶73. Erick asserts that the chancery court erred in finding that the factor did not favor either party and argues that the factor actually favored him. He asserts that although he admitted to smoking marijuana and "to drinking beer in moderation, . . . unlike Carrie, [he] never abandoned his children." Erick also asserts that Carrie illegally calling in the hydrocodone, giving him a bag of marijuana for his birthday, and her "exposing [the] children to adulterous behavior" likewise showed her "lack of moral standards."

¶74. For the reasons we have already addressed with respect to these assertions, we find no error in the chancery court's conclusion that this factor favors neither parent. The chancery court took into account the relevant evidence relating to Erick's assertions in reaching its conclusion and we find that substantial, credible evidence supports the chancery court's determination on this factor.

*Factor 8: the Home, School, and Community Record of the Child*

¶75. The chancery court found that this factor favored Carrie, finding that although the children "generally earned high scores in school," Edward "failed his music course in the spring of 2017, which was during the time he lived with Erick. . . . [Edward] has not failed any courses when in his mother's care." The chancery court further recognized that Edward is on the high school sailing team and . . . Erick . . . pays for [Edward's] private coaching."

32

Regarding Leo and Hunter, the chancery court found that they "played soccer during the 2016 school year, but were not registered for the 2017 school year."

¶76. Erick asserts that this factor favors him, not Carrie, due to his involvement in the children's activities, because Edward was taken to the youth detention center for one night while in Carrie's custody, and because Carrie admitted that "the children missed school on several occasions" when they were in their care. The chancery court, however, heard all the evidence pertaining to the circumstances leading to Edward being taken to the youth detention center for one night and also heard Carrie's testimony explaining that she allowed the children to stay home from school the next day because they were upset; and, similarly, she allowed the children to stay home another time when the police were called the night before due to confrontations at the marital home.

¶77. Erick's challenge to this factor, like all his challenges to the chancery court's determinations with respect to the *Albright* factors, is "premised on the chancellor's evidentiary and credibility assessments." *O'Briant v. O'Briant*, 99 So. 3d 802, 806 (¶18) (Miss. Ct. App. 2012). As this Court has recognized, "[i]n our narrow review we give deference to the chancellor's factual findings, . . . [and] [t]he chancellor has the ultimate discretion to weigh the evidence the way [he] sees fit in determining where the child's best interest lies." *Id.* (internal quotation marks omitted). Particularly in the light of our very deferential standard of review, we find no error in the chancery court's determination with respect to this factor.

¶78.    The chancery court found with respect to this factor that Edward "was the only child of age to express a preference for a particular parent" and that Edward testified he would prefer to live with Erick. The chancery court determined, however, that "because of Erick's drinking and permitting [Edward] to drive a vehicle as an unlicensed and underage driver, as to [Edward], the court does not find this factor favors Erick." With respect to Leo and Hunter, the chancery court found that this factor did not favor either parent because these children were too young at the time of trial to express a preference.

¶79.    Erick asserts that the chancery court erred in its determination on this factor because "[Edward's] expressed preference [to stay with Erick] was the only relevant fact to . . . [consider for] this factor." We find that this is an incorrect statement of Mississippi law. Pursuant to Mississippi Code Annotated section 93-11-65 (Rev. 2013), consideration of a child's preference (who is twelve years old or older) is in the chancery court's discretion to decide:

> [T]he chancellor *may* consider the preference of a child of twelve (12) years of age or older as to the parent with whom the child would prefer to live in determining what would be in the best interest and welfare of the child. The chancellor shall place on the record the reason or reasons for which the award of custody was made and explain in detail why the wishes of any child were or were not honored.

(Emphasis added). Thus, "the chancellor is not bound by the election of a minor child . . . . But, if a chancellor declines to follow a child's preference, he must place the reasons in the

34

record." *Sheridan v. Cassidy*, 273 So. 3d 783, 788 (¶21) (Miss. Ct. App. 2018) (citation and internal quotation mark omitted).

¶80.    In this case, the chancery court precisely followed the requirements of section 93-11-65.  The chancery court allowed Edward to express his preference, acknowledged that Edward preferred to live with his father, and then clearly articulated the reasons that it nevertheless did not find that this factor favored Erick.  We find no error in this determination.

*Factor 10: Stability of Home and Employment of Each Parent*

¶81.    In finding that this factor favored Carrie, the chancery court recognized although both "parties have demonstrated a stable employment record," there were several incidents reflected in the record where Erick showed "physical violence towards the minor children, such as Erick flipping the kitchen table on Elizabeth while she was assisting [Leo] with homework, punching a hole in a bedroom door, and pulling [Edward] by the hair." Continuing, the chancery court found that "[i]t is clear that the environment in Erick's home is not suitable for raising children. This factor favors Carrie."  Although Erick asserts that the chancery court erred in finding that this factor favored Carrie, and not him, we find no merit in this assertion.  Our own review of the record shows that substantial, credible evidence supports the chancery court's determination on this factor.

*Conclusion Regarding the* Albright *Factors*

¶82.    In sum, we find that the chancery court thoroughly analyzed and applied the facts of

this case using the *Albright* factors and provided a comprehensive explanation for its findings as to each factor. For the reasons addressed above, and in light of our very deferential standard of review with respect to this matter, we find no error in the chancery court's award of legal and physical custody of the minor children to Carrie, and its grant of regular visitation to Erick, as set forth in the chancery court's judgment.

### III. Jurisdiction and Notice Relating to Carrie's Motion for Contempt

¶83. Erick asserts that the chancery court "did not have jurisdiction to hear Carrie's [m]otion for [c]ontempt against [him] due to improper notice." The record reflects that Carrie filed a motion for contempt on December 28, 2017, alleging that Erick failed to pay the full amount of the child support he owed in violation of the chancery court's September 11, 2017 temporary order. Under that order, the chancery court required Erick to pay child support for the minor boys in the amount of $250 for the month of September 2017 and $500 per month, beginning October 1, 2017. Carrie also sought attorney's fees in her motion for contempt. The motion's certificate of service indicated that Erick was personally served with the motion on December 28, 2017. The record indicates that on December 27 (one day before the motion was filed) a Rule 81 summons was issued for the motion, summoning "[Erick] to appear and defend against said motion for citation and contempt at 9:00 a.m. on the 3rd day of January 2018."

¶84. Erick asserts that the return date of January 3, 2018, on the Rule 81 summons failed to provide him with the seven-days' notice required by Mississippi Rule of Civil Procedure

36

81(d)(2) because the actual motion for contempt was not filed until December 28 (only six days before January 3), and a summons was not re-issued.

¶85. Rule 81(d)(2) provides that "[t]he following actions and matters shall be triable 7 days after completion of service of process in any manner, . . . to-wit: . . . contempt." Additionally, Rule 81(d)(5) provides that "[u]pon the filing of any action or matter listed in subparagraphs (1) and (2) above, summons shall issue commanding the defendant . . . to appear and defend at a time and place . . . at which the same shall be heard."

¶86. We begin by addressing Erick's assertion that the chancery court lacked "jurisdiction" to hear Carrie's contempt motion. We reject this claim "because chancery courts have on-going personal jurisdiction over parties to a divorce proceeding." *Dennis v. Dennis*, 824 So. 2d 604, 610 (¶16) (Miss. 2002). This was a pending divorce action in which Erick had been summoned to answer (and answered) Carrie's original complaint for divorce.

¶87. Regarding Erick's improper notice assertions, we recognize that Rule 81 was not explicitly followed in this case. We further recognize that "[i]n contempt proceedings, *complete absence of service of process* offends due process and cannot be waived." *Id.* at 609 (¶13) (emphasis added) (internal quotation mark omitted). But that is not the case here. The record reflects that Erick *did* receive notice of Carrie's motion for contempt, albeit imperfect, and we find that Erick did not properly preserve any objection to the improper notice but instead allowed evidence to be presented at trial on this issue. We further find that Erick was not prejudiced by any lack of proper notice. For these reasons, and as we discuss

37

below, we find that Erick he has waived his improper service claims, and we find no abuse of discretion in the chancery court rendering a determination on Carrie's motion for contempt and request for attorney's fees. *Id.* at 610 (¶16) (finding that husband waived his defective service claim despite the fact that he was not served with a Rule 81 summons in a contempt action).

¶88.    With respect to our waiver determination, we recognize that Erick asserts in his appellant's brief that on January 3, 2018, before trial began, the parties met with the chancellor in chambers. Erick asserts that at this time he objected to the motion for contempt being heard because of improper notice. According to Erick, the chancellor "indicated in chambers that the [m]otion for [c]ontempt could not go forward due to the need for the requisite Rule 81 notice." In our review of the record, however, we do not find that there is a transcript of this exchange. Indeed, in denying Erick's Rule 59(e) motion on this issue and other issues, the chancery court found that "[t]he issues addressed by Erick in his Motion were tried and considered by the Court at trial."

¶89.    Nor do we find anything in the record showing that Erick filed a motion to strike Carrie's contempt motion, made any attempt to obtain a definitive ruling from the chancellor on this issue, or objected to testimony and evidence on this issue that Carrie presented at trial. In particular, on January 4, Carrie testified in detail about the support payments Erick had not made, and no objection was made to this testimony. In the course of her testimony on this issue, a summary of the back child support payments was admitted into evidence (Exhibit

38

22), which indicated that Erick he was in arrears at the time of trial in the amount of $1,750. Erick's counsel stated, "No objections to the exhibit itself, Your Honor," and no other objection was made.

¶90. We find that these circumstances, taken together, amount to a waiver on Erick's part of his defective service claim. *Dennis*, 824 So. 2d at 610 (¶16); *see also Floyd v. City of Crystal Springs*, 749 So. 2d 110, 120 (¶35) (Miss. 1999) ("This Court has held that it is the duty of the objecting party to obtain a ruling by the trial court on objections, and that if the record includes no ruling by the trial court, the objections are waived for purposes of appeal."); *Rushing v. State*, 711 So. 2d 450, 456 (¶17) (Miss. 1998) ("It is well-established that it is the responsibility of the movant to obtain a ruling from the court on motions filed by him and failure to do so constitutes a waiver of same." (internal quotation mark omitted)).

¶91. We further find that Erick was not prejudiced by Carrie's motion for contempt being considered at trial. Indeed, Erick was *timely* served with a Rule 81 summons on December 27, 2017, notifying him that Carrie's motion for contempt would take place on January 3—the first day of the *pending* divorce trial and a date that had been noticed since September 7, 2017. Further, Erick was put on notice of Carrie's contempt allegations just one day later when he was personally served with her motion for contempt. We also observe that no evidence was presented relating to Carrie's motion for contempt until January 4, when Carrie testified (without objection from Erick) about his failure to pay portions of what he owed for child support. This was seven days from December 28, 2017, the day Erick was personally

39

served with Carrie's motion.

¶92.    Erick also asserts that the chancery court improperly heard the motion for contempt because a Rule 81 summons was not re-issued after the motion for contempt was filed. Under the circumstances of this case, we do not find that this is a significant factor.  In *Sanghi v. Sanghi*, 759 So. 2d 1250, 1253 (¶13) (Miss. Ct. App. 2000), this Court explained that the reason a Rule 81 summons is required is because "[a] domestic relations case remains subject to recurring motions even after all prior contested matters are resolved. A pleading to alert the other party that a new dispute has arisen *is in the nature of awakening a dormant suit*, distinguishable both from commencing new litigation and from just filing a motion in active litigation."  (Emphasis added).  As such, "[t]he applicable procedural rule is one that applies to petitions to modify or enforce *final* custody, alimony or support judgments." *Id.* (emphasis added) (citing M.R.C.P. 81(d)(2)).[13]  This Court also recognized in *Sanghi* that "[t]he supreme court has held that a modification hearing [that also requires

_____

[13] Indeed, Rule 81(d)(6) provides that "Rule 5(b) notice shall be sufficient as to any temporary hearing in a *pending* divorce, separate maintenance, custody or support action provided the defendant has been summoned to answer the original complaint." (Emphasis added).  As noted, Erick was summoned to answer, and did answer, Carrie's original complaint for divorce.
    Citing *Doe v. Smith*, 200 So. 3d 1028, 1031 (¶25) (Miss. 2016), the separate concurrence asserts that absent waiver, a continuance and service of additional Rule 81 summons on Erick would have been necessary.  *Doe* involved an independent lawsuit by a child's natural father seeking to set aside an adoption in which he had not been a party, 200 So. 3d at 1030 (¶2)—not a motion filed by a party against a party in a *pending* divorce as is the case here.  Under these circumstances, we find *Doe* distinguishable and the discussion in *Sanghi* regarding the purpose of a Rule 81 summons instructive in this case.

a Rule 81(d)(2) summons] may be conducted, even though the proper summons under Rule 81 was not issued, if the defendant actually appears." *Id.* at 1257 (¶31) (citing *Saddler v. Saddler*, 556 So. 2d 344, 345-46 (Miss.1990)).

¶93. Although *Sanghi* is not a contempt case, we find the general principles recognized in that case are helpful here. The parties' divorce was not a "dormant suit," and a "final" judgment of divorce had not been entered. Rather, the motion for contempt was filed in was a pending divorce in which Erick had answered in response to a summons issued on Carrie's original complaint for divorce. The motion was heard at a properly noticed trial in which Erick obviously appeared, and the first time testimony was presented at trial on the contempt issue (without objection from Erick) did not occur until seven days from when Carrie's motion for contempt was filed. We find that the fact that a Rule 81 summons was not re-issued does not change our determination that the chancery court did not abuse its discretion in hearing and rendering a decision on Carrie's motion for contempt and request for attorney's fees in this case.

### IV. The Chancery Court's Determination that Erick was in Contempt and its Award of Attorney's Fees to Carrie

¶94. Erick asserts that the chancery court erred, on the merits, in finding him in contempt of its September 11, 2017 temporary order and awarding Carrie attorney's fees in connection with her motion for contempt. We find no merit in either of these contentions.

¶95. As noted above, the September 11, 2017 temporary order required Erick to pay $250 in child support for the month of September 2017 and $500 per month in child support,

beginning October 1, 2017. When Carrie testified on January 4 at trial, her testimony showed that Erick had made only partial payments with respect to these amounts. Exhibit 22 that was admitted into evidence set forth the payments that had been made and also showed that Erick was in arrears on his child support payments in the amount of $1,750. This evidence therefore established that Erick had failed to comply with the chancery court's temporary order.

¶96. The "failure to comply with a court order is prima facie evidence of contempt." *Doyle v. Doyle*, 55 So. 3d 1097, 1111 (¶46) (Miss. Ct. App. 2010). As we recognized in *Doyle*, "[t]he burden then shifts to the defendant who may rebut the prima facie case by proving inability to pay, lack of willfullness regarding the contempt, ambiguity in the order's provisions, or impossibility of performance." *Id.* (quoting Deborah H. Bell, *Bell on Mississippi Family Law* § 11.05[1][a], at 343 (1st ed. 2005)). "Civil contempt . . . must be proven by clear and convincing evidence." *Id.* "A chancellor has substantial discretion in deciding contempt matters because of the chancellor's temporal and visual proximity to the litigants." *Hickey v. Hickey*, 166 So. 3d 43, 48 (¶13) (Miss. Ct. App. 2014) (internal quotation marks omitted).

¶97. Based upon our review of the record, we find that Erick offered no specific evidence or testimony at trial evidencing his inability to fully pay the child support that he owed. In a contempt matter, "[i]t is well established that the payor must prove the inability to pay 'with [particularity] and not in general terms.'" *Doyle*, 55 So. 3d at 1111 (¶47) (quoting *Morreale*

42

*v. Morreale*, 646 So. 2d 1264, 1267 (Miss. 1994)).

¶98.   Erick asserts that he testified at trial he "financially struggled," but when he was asked whether he had difficulty providing food for the children after the separation, he responded, "No, I didn't have [any] problems providing food for my children." However, when he was shown the photographs of the nearly empty refrigerator and freezer at the marital home when the children were staying with him (admitted into evidence), Erick elaborated, testifying that "at the time I was financially struggling because I was getting no financial assistance taking care of four kids. So it wasn't like I could afford a four or $500 Sam's trip to, like, stock up the freezer with, like, pork loin and all of that stuff."

¶99.   Additionally, Erick cites Carrie's testimony when she said that Erick told her he could not pay the entire monthly amount. Carrie testified:

| [COUNSEL FOR CARRIE:] | So he would owe a total of $2,250 pursuant to the temporary order, and he's made a payment of $1,065? |
|---|---|
| [CARRIE:] | Yes. |
| [COUNSEL FOR CARRIE:] | Has he given you any explanation of why he's not following the Court's order and paying you the amount of child support in a timely manner as he's required? |
| [CARRIE:] | No. |
| [COUNSEL FOR CARRIE:] | Has he ever told you he doesn't have any money? |
| [CARRIE:] | Yes. |

43

| [COUNSEL FOR CARRIE:] | Has he told you he doesn't have money . . . to pay you the child support? |
|---|---|
| [CARRIE:] | Correct. |

¶100. We do not find that this evidence was sufficient to rebut Carrie's prima facie case of non-payment. Erick did not offer any bank statements or other evidence demonstrating his inability to pay, nor did he offer *specific* testimony about his inability to fully pay the child support payments. In *Doyle*, when [the payor] was asked why he did not pay the various judgments, he merely stated repeatedly that he "didn't have the money" to each query. He offered no particular proof of why he did not have the funds." *Id.* at (¶48). As such, the Court in *Doyle* found no merit in the payor's contentions that he was unable to pay the court-ordered judgments entered in the parties' divorce. *Id.* For the reasons addressed above, we find that the same analysis applies here.

¶101. Erick also asserts that the fact that he made partial child support payments evidences his "lack of unwillingness" to make these payments. We find no merit in this contention for the simple reason that it is *no* evidence of his willingness to pay the *entire* judgment, especially in the light of his failure to demonstrate, "with particularity," *Morreale*, 646 So. 2d at 1267, his inability to pay.

¶102. In sum, we find no abuse of the chancery court's "substantial discretion" in deciding that in this case, Erick was in contempt of its temporary order due to his failure to pay $1,750 in child support.

¶103. Lastly, Erick asserts that the chancery court erred in awarding Carrie $1,000 in attorney's fees relating to her motion for contempt. He asserts that this is improper because he purportedly demonstrated his inability to pay and a lack of unwillingness on his part to make the child support payments. Erick does not challenge the $1,000 attorney's fees amount awarded. As we discussed in detail above, we find that the chancery court's contempt award was supported by substantial, credible evidence, and we likewise find no error in the chancery court awarding Carrie attorney's fees in the modified amount of $1,000.[14] *Elliott v. Rogers*, 775 So. 2d 1285, 1290 (¶25) (Miss. Ct. App. 2000) ("When a party is held in contempt for violating a valid judgment of the court, then attorney's fees should be awarded to the party that has been forced to seek the court's enforcement of its own judgment.").

## V. Erick's Motion to Alter or Amend the Judgment

---

[14] In its order entered on April 19, 2019, the chancery court corrected its original judgment with respect to the attorney's fees, reducing the original $4,000 amount awarded to $1,000, as follows:

> Carrie has additionally requested an award of attorney's fees associated with her prosecution of the issue of contempt. However her attorney's billing statement, entered into evidence as Exhibit 44, is not itemized with respect to contempt. The court, having reviewed the billing statement, evidencing a total bill of $19,784.36, finds that four (4) hours at $250.00 per hour is reasonable for the charges attributable to the contempt issue. The court therefore enters judgment for Carrie and against Erick for Carrie's attorney's fees associated with the prosecution of the contempt issue in the amount of $1,000.00. . . . The Court makes this correction to reflect the hourly rate customarily charged by Carrie's counsel and finds that the same is reasonable in light of the work performed and the difficulty of the case at hand.

45

¶104. Erick asserts that the chancery court erred in denying his motion to alter or amend the judgment brought pursuant to Rule 59(e). In his Rule 59(e) Erick asserted that the chancery court was without "personal jurisdiction" to hear Carrie's motion for contempt due to the allegedly defective Rule 81 summons and improper notice. Erick claims that the chancery court wrongfully granted the motion and awarded attorney's fees to Carrie with respect to that motion.

¶105. Additionally, Erick sought to reopen the chancery court's judgment on the child support issue to allow him to present "evidence concerning the loss of [his] employer-provided major medical insurance . . . [that] was unavailable at the time of trial."

¶106. "[T]o succeed on a Rule 59(e) motion, the movant must show: (I) an intervening change in controlling law, (ii) availability of new evidence not previously available, or (iii) need to correct a clear error of law or to prevent manifest injustice." *Brooks v. Roberts*, 882 So. 2d 229, 233 (¶15) (Miss. 2004). We "review[] a trial court's denial of a Rule 59 motion under an abuse of discretion standard." *Id.*

### A. The Motion for Contempt Issues

¶107. We find no abuse of discretion in the circuit court's decision to deny Erick's Rule 59(e) motion with respect to Carrie's motion for contempt and the award of attorney's fees relating to this motion. Erick presented no new evidence on this issue, nor did he cite to "an intervening change in controlling law." *Id.* Further, for all the reasons we have already addressed above in affirming the chancery court's findings and determinations regarding

Carrie's motion for contempt and the award of attorney's fees relating to that motion, we do not find that Erick demonstrated any "manifest errors of law or fact" in the chancery court's judgment on this issue.

### B. Loss of Paid Major Medical Insurance Coverage for the Minor Children

¶108. In his Rule 59(e) motion, Eric also sought to re-open the judgment so that the chancery court could consider "newly-discovered evidence" regarding his payment of health insurance costs for the minor children as set forth in the judgment.[15] In his motion, Erick stated that his employer at the time of trial "paid the entire cost of the major health coverage [for the minor children,] which was a substantial expense," and that his new employer does not pay for his major medical insurance coverage. Erick states in his appellant's brief that the company Erick worked for at the time of trial merged with another entity in September 2018. Erick therefore requested that the portion of the judgment requiring Eric to provide health insurance for the minor children through his employer "should be amended to require [Carrie] to share in the cost of providing all health insurance coverage for the minor

---

[15] Paragraph 45 of the judgment provides, in relevant part:

Health Insurance: Erick currently provides health insurance for the minor children through his employer (Ex. 10, 38) and shall continue to do so to include major medical health coverage, vision, prescription, and dental insurance, until each child reaches the federal maximum age permitted for dependent coverage, and qualifies for such coverage under applicable federal or state law. The parties shall each be responsible for one-half . . . of the cost of deductibles and co-payments, out-of-pocket expenses, and medication expense related to the children.

47

children."

¶109. In *McNeese v. McNeese*, 119 So. 3d 264, 272 (¶20) (Miss. 2013), the Mississippi Supreme Court recognized that "[a] Rule 59 motion for a new trial . . . may be based on newly discovered evidence." In this regard, the supreme court found:

> A motion for a new trial based on new evidence is an extraordinary motion, and the requirements of the rule must be strictly met. The motion may not be granted unless (1) the evidence was discovered following the trial; (2) due diligence on the part of the movant to discover the new evidence is shown or may be inferred; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; (5) the evidence is such that a new trial would probably produce a new result.

*Id.* (quoting *Smullins v. Smullins*, 77 So. 3d 119, 125 (¶23) (Miss. Ct. App. 2011)). "Review of a [chancellor's] denial of . . . a Rule 59 motion for a new trial is limited to abuse of discretion." *Id.* Additionally, "[a]lthough Rule 59(a) refers to a 'new trial,' when a case was tried to the court, the formality of a full retrial is not required." *Pevey v. Pevey*, 270 So. 3d 250, 255 (¶7) (Miss. Ct. App. 2018). Specifically, "[u]nder Rule 59(a), the chancellor 'may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.'" *Id.* (quoting M.R.C.P. 59(a)).

¶110. In this case, the parties' divorce trial ended on January 8, 2018, closing arguments were heard in March 2018, and the chancery court entered its judgment of divorce on November 30, 2018. As noted, according to the assertions in Erick's appellant's brief, Erick's previous employer merged with his new employer in September 2018.

48

¶111. Although we recognize that the companies' merger occurred after trial, we find that it is relevant that Erick appears to have had over two months while the divorce judgment was pending to notify the chancery court of the change in circumstances relating to his major medical insurance coverage. *Cf. Woods v. Victory Mktg. LLC*, 111 So. 3d 1234, 1235 (¶1) (Miss. Ct. App. 2013) (The Court found that the plaintiffs' Rule 60(b) motion to reconsider was "properly denied" where it was based upon "evidence they could have presented while the summary-judgment motion was pending."); *Smullins*, 77 So. 3d at 125 (¶25) (The Court found no abuse of discretion when the chancellor denied a new trial based upon new evidence where the chancellor "concluded that [the movant] had failed to exercise due diligence to discover the new evidence *and to present the new evidence to the court prior to the entry of a final judgment*.") (emphasis added)).

¶112. Further, even though Erick *asserted* in his Rule 59(e) motion that payment of the minor children's major medical insurance coverage is a "substantial expense," we find no evidence supporting this assertion in the record or that any such evidence was presented to the chancery court. We also observe that Erick acknowledges that his former employer only paid for the minor children's major-medical insurance coverage. As such, loss of this paid coverage does not affect the "vision, prescription, and dental insurance" that Erick was also ordered to pay under the judgment. As such, it does not appear that Erick established the "materiality" of this change in circumstances in his Rule 59(e) motion. Under these circumstances, we find no abuse of discretion in the chancery court denying Erick's request

49

to re-open the judgment with respect to the health insurance coverage issue.

¶113. **AFFIRMED.**

**GREENLEE AND LAWRENCE, JJ., CONCUR. BARNES, C.J., WILSON, P.J., AND McCARTY, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY GREENLEE, McDONALD AND McCARTY, JJ.**

**WESTBROOKS, J., SPECIALLY CONCURRING:**

¶114. As Presiding Judge Carlton's opinion for the Court states, "Erick asserts that the chancery court 'did not have jurisdiction to hear Carrie's [m]otion for [c]ontempt against [him] due to improper notice.'" I agree with the outcome, and I write separately to discuss the specific facts of this case alongside the requirements of Rule 81 of the Mississippi Rules of Civil Procedure.

¶115. Mississippi Rule of Civil Procedure 81(d)(2) states that actions such as this one "shall be triable seven days after completion of service of process." There are two distinct requirements at issue here: at least seven days' notice; and that the hearing occur on the date in the summons. In this case, Carrie had a Rule 81 summons issued on December 27, 2017, but did not file the subject motion until December 28, 2017. The earliest Carrie's motion could have been heard, pursuant to Rule 81(d)(2), would have been January 4, 2018. Despite this deficiency, Erick appeared with counsel for a hearing on Carrie's motion for contempt. However, Carrie's motion for contempt was not addressed on January 3, 2018. Instead, it was addressed on January 4, 2018, creating a second deficiency. I do not agree that simply

50

because Erick was present in court that the Rule 81 summons for the contempt hearing was not deficient.

¶116. The only way to cure the deficiency surrounding Carrie's Rule 81 summons, as pertaining to the seven-day requirement, is through waiver. As this Court has stated, appearing with counsel and failing to object waives any error or deficiency. *Carroll v. Carroll*, 976 So. 2d 880, 885 (¶10) (Miss. Ct. App. 2007). Although Carrie's Rule 81 summons failed to give Erick the requisite seven days, his appearance with counsel—without preserving any objection in the record—waived any issues concerning the seven-day requirement of Rule 81.

¶117. Additionally, Carrie's summons was deficient because it summoned Erick to a hearing on January 3, 2018, that did not occur. Our Supreme Court has held that "when a Rule 81(d) action, not heard on the merits, is continued without an order, the proper procedure is to reissue Rule 81(d) summons, listing the new time and date the action will be heard." *Doe v. Smith*, 200 So. 3d 1028, 1035 (¶25) (Miss. 2016) (citing *Caples v. Caples*, 686 So. 2d 1071, 1074 (Miss. 1996)).[16] In the instant case, the chancellor failed to enter an order of continuance and have Carrie serve Erick with an additional Rule 81 summons. However, just

---

[16] The Court's opinion finds *Sanghi v. Sanghi*, 759 So. 2d 1250 (Miss. Ct. App. 2000), more instructive than *Doe*. *Sanghi* involved an unrepresented ex-husband "who was properly served with the petition seeking contempt by certified mail and received notice of the correct hearing date and time by first class mail." *Sanghi*, 759 So. 2d at 1257 (¶31). The question before this Court in *Sanghi* was whether Dr. Sanghi made an appearance which waived his ex-wife's failure to comply with Rule 81. This is different from the issue that is currently before us.

as with the seven-day requirement, so too was this deficiency waived by Erick's appearance with counsel on January 3, 2018.

¶118.  The summons issued to Erick failed to satisfy the requirements of Rule 81(d)(2) of the Mississippi Rules of Civil Procedure.  "The Supreme Court has found that compliance with Rule 81 is mandatory." *Sanghi*, 759 So. 2d at 1258 (¶36) (citing *Powell v. Powell*, 644 So. 2d 269, 274 (Miss. 1994)). This Court further stated, "We read that to mean that it is mandatory unless the defendant has, as in *Saddler*, done something to waive his right to insist upon proper service." *Id*.  Erick waived the Rule 81 deficiencies by appearing with counsel. Carrie chose Rule 81 and is bound by its requirements. Absent the waivers discussed, Carrie's failure to comply with Rule 81 would have required a different outcome.

**GREENLEE, McDONALD AND McCARTY, JJ., JOIN THIS OPINION.**